**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RUDOLPH A. KARLO, MARK K. MCLURE, WILLIAM S. CUNNINGHAM, JEFFREY MARIETTI, DAVID MEIXELSBERGER, BENJAMIN D. THOMPSON, and RICHARD CSUKAS, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 10-1283 Judge Nora Barry Fischer |
| vs. | ) ) | |
| PITTSBURGH GLASS WORKS, LLC, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Pending before the Court is the "Plaintiffs' Motion for Conditional Class Certification and Court Facilitated Notice" ("the motion"). (Docket No. 88). The motion is ripe for adjudication. For the following reasons, Plaintiffs' motion for conditional certification (Docket No. 88) is GRANTED, in part, in accord with the following.

**I.     Introduction**

This action is brought by named Plaintiffs Richard Csukas, Jeffrey Marietti, Mark K. McLure, Benjamin D. Thompson, Rudolph A. Karlo, David Meixelsberger and William S. Cunningham ("Plaintiffs") and against Pittsburgh Glass Works, LLC ("PGW" or "Defendant"). The Plaintiffs' claims arise from a March 2009 reduction in force ("RIF"). (Docket No. 54 at ¶ 103). This RIF resulted in the termination of each of the named Plaintiffs. Plaintiffs claim that the RIF was conducted in a manner giving rise to an inference of age discrimination.

Their Amended Complaint (Docket No. 54) raises three counts. Count I claims disparate treatment under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*

(*Id.* at 36-37).  Count II alleges disparate impact.  (*Id.* at 38-39).  Finally, Count III claims retaliation under the ADEA.  (*Id.* at 39-41).

### a.  The Parties

PGW is a limited liability corporation whose business was owned by PPG Industries, Inc. ("PPG") until late 2008.  (Docket No. 54 at ¶ 8; Docket No. 73 at ¶ 8).  PGW admits that, since its formation, it has been an "employer" within the meaning of 29 U.S.C. § 623.  (Docket No. 73 at ¶ 9).  Each of the plaintiffs is over fifty years old.  (Docket No. 54 at ¶¶ 1-7; Docket No. 73 at ¶¶ 1-7).  They claim that they are all former employees of PGW and that they were previously long-time PPG employees.  (*Id.* at ¶ 10).  PGW responds that all of the plaintiffs were employees at certain times, but at other times, several of the plaintiffs were employed by another company and worked with PGW through a contract with that company.  (Docket No. 73 at ¶ 10).  The Plaintiffs have all filed charges of employment discrimination based on age against PGW with the Equal Employment Opportunity Commission, and alleged more than 60 days have elapsed without the Plaintiffs receiving a Dismissal or Notice of Rights.  (Docket No. 54 at ¶¶ 17-18)

Karlo began working for PPG on October 9, 1978.  (*Id.* at ¶ 24).  McLure began working at PPG in 1974.  (*Id.* at ¶32).  Cunningham began his career with PPG in April 1996.  (*Id.* at ¶ 41).  Marietti was hired in 1984.  (*Id.* at ¶ 47).  Meixelsberger was hired in 1987.  (*Id.* at ¶ 54).  Thompson was brought in as a part-time employee in 1971, his position was terminated in 1972, and he was rehired on a permanent basis in 1972.  (*Id.* at ¶¶ 60-61).  Csukas started with PPG in 1973.  (*Id.* at ¶ 76).

### b.  The Formation of PGW

PGW was formed on October 1, 2008, when the auto glass businesses of PPG Industries, Inc. were spun off to create a new company.  (Docket No. 104-1 at ¶ 3).  One of PGW's core

businesses is the production of automotive glass, such as windshields, rear windows and side windows to car manufacturers as an original equipment manufacturer ("OEM"). (*Id.* at ¶ 5).

Around the time PGW was formed, General Motors, Ford and Chrysler appeared before Congress to request bailout funds. (Docket No. 104-2). Due to the downturn in the economy, PGW took drastic steps to "combat rapidly deteriorating sales", including the closure of two Canadian facilities and one Michigan facility. (Docket No. 106 at 4; *see generally* Docket No. 104-3). Between 2008 and 2009, North American vehicle production took a precipitous dive. (Docket No. 104-4 at 1 (stating that car sales in 2009 would be "an eighteen (18) year low")). Several of the named plaintiffs acknowledge the downturn in the economy. (*See* Docket No. 106 at 6 (citing depositions of Plaintiffs Csukas, Cunningham, McLure and Meixelsberger)). PGW maintains that the economic downturn led to an initial RIF in late 2008. (Docket No. 104-3 at 2).

### c. The March 2009 RIF

Tony Hartmann, PGW's Vice President of Human Resources, departed from the company in late 2008. (Docket No. 106 at 7). Kevin Cooney was brought in to replace him on an interim basis. (*Id.*). Cooney worked on a reorganization plan in which each business unit director in the company identified the work that needed to be done and the personnel that were necessary to perform that work. (*Id.* (citing Docket No. 104-12 at 47)).

The First Amended Complaint alleges that all of the Representative Plaintiffs were terminated over a two-day period in March 2009. (Docket No. 54 at ¶ 103). Mr. Csukas was terminated by Dave King, a PGW supervisor at the Evansville, Indiana facility. (*Id.* at ¶¶ 104-107; Docket No. 73 at ¶¶ 104-107 (admitting that Mr. Csukas was terminated)). On March 31, 2009, Mr. Thompson was informed of his termination by the Creighton Plant Manager, Craig Barnett, and Human Resources Manager, Myrtle Smith. (Docket No. 54 at ¶ 111; 73 at ¶ 111

(admitting termination and presence of Mr. Barnett and Ms. Smith)). Also on that date, the remainder of the named Plaintiffs – Messrs. Karlo, McLure, Cunningham, Marietti and Meixelsberger – were terminated by Gary Cannon, Director of Manufacturing at the Harmarville, Pennsylvania facility. (Docket No. 54 at ¶¶ 120-121; 73 at ¶¶ 120-121).

A total of 105 salaried employees were terminated in the 2009 RIF. (Docket No. 106 at 6). In performing the RIF, upper management relied upon the individual directors of each unit to determine which employees must be retained and which might be terminated. (*Id.* at 7; Docket No. 104-12 at 47, 71-72). The criteria used in the RIF revolved around the work that was done in each unit, and the "[e]ducation, background, breadth of experience, and so forth." (Docket No. 104-12 at 72).

### d. Procedural History

Plaintiffs' motion was filed on October 3, 2011. (Docket No. 88). The parties' initial briefs on the motion are filed at Docket Numbers 91, 106, 113 and 126. On November 10, 2011, Defendant filed a motion for summary judgment concurrently with its response to the present motion. (*See* Docket No. 101). Defendant's Appendix (Docket No. 104) is referenced both in the motion for summary judgment and in its filings pertaining to the currently-pending motion.

On December 19, 2011, the Court convened a motion hearing on Plaintiffs' motion for conditional certification, at which time the Court heard argument and then ordered the parties to file additional briefing on the issue of the Court's consideration of expert testimony at the conditional certification stage. (Docket Nos. 131-132). The parties then filed their supplemental briefs on January 4, 2012. (Docket Nos. 135, 136).

Shortly thereafter, on January 13, 2012, the parties filed a joint motion to stay the Court's consideration of the pending motion while the parties participated in mediation. (Docket No.

141). This motion was granted on January 17, 2012. (Docket No. 145). On February 3, 2012, the Court received a report from the mediator indicating that the case had not settled. (Docket No. 149). The parties then filed additional supplemental citations to authority. (Docket Nos. 154, 158). The Court held a second motion hearing on March 9, 2012 (Docket No. 161) and received the transcript of that hearing on April 23, 2012. (Docket No. 176).[1]

## II.    Legal Standard

Through the pending motion, Plaintiffs seek conditional certification of their collective ADEA claim and court-facilitated notice of same. Pursuant to 29 U.S.C. § 216(b) of the Fair Labor Standards Act ("FLSA"), which is incorporated into the ADEA via Section 7(b) of that Act, potential plaintiffs must opt in to a collective action suit and affirmatively notify the court of their intentions to join the suit. *Sperling v. Hoffman-La Roche Inc.*, 862 F.2d 439, 444 (3d Cir. 1988) ("*Sperling II*"), *aff'd Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) ("*Sperling*"). It is not sufficient simply to "opt-in" to a collective action under § 216(b). The representative plaintiffs must also show that the potential plaintiffs are "similarly situated" to the representative plaintiffs. *See* 29 U.S.C. § 216(b); *Sperling II*, 862 F.2d at 444.

Courts typically follow a two-tiered analysis in determining whether a case may move forward as a collective action. The first phase, or "notice" phase, requires that a court "make[] a preliminary determination whether the employees enumerated in the complaint can be provisionally categorized as similarly situated to the named plaintiff." *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 192 (3d Cir. 2011). If the plaintiff carries this burden, the

---

[1] Between the March 9, 2012 hearing and the issuance of the transcript, the Court received Defendant's Motion for Leave to File Supplement (Docket No. 164) and Motion to Withdraw (Docket No. 169). The Motion for Leave to File Supplemental Authority was renewed (Docket No. 172) and subsequently denied. (Docket No. 178). The Court has not considered the supplemental authority – an Arbitrator's Order and Opinion from another case involving Defendant – in deciding the present motion.

collective action is "conditionally certified" for purposes of notice and discovery. *Id.* The second phase is addressed after all putative class members have had an opportunity to opt in and further discovery has taken place. *Mueller v. CBS, Inc.*, 201 F.R.D. 425, 428 (W.D.Pa. 2001) (Ambrose, J.). At this stage, the court "reconsiders the class certification question using a 'similarly situated' standard, that is, by conducting a fact-specific review of each class member who has opted-in, taking into account factors such as employment setting, termination procedures, defenses asserted against various plaintiffs, and other procedural issues." *Id.*

Until recently, there was a split amongst the district courts within the Third Circuit as to the necessary showing at the notice stage. *See Symczyk*, 656 F.3d at 192. Some required nothing more than a "substantial allegation," while others required the plaintiff to make a "modest factual showing" to support his claim that the proposed plaintiffs are similarly situated. *Id.* The Court of Appeals has spoken on this issue in an FLSA case, rejecting the "substantial allegation" standard and adopting the "modest factual showing" standard. *Id.* at 192-93. Even so, the standard is not particularly high: "a plaintiff must produce some evidence, 'beyond mere speculation,' of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected the other employees." *Id.* at 193 (citing *Smith v. Sovereign Bancorp., Inc.*, No. 03-2420, 2003 WL 22701017, at *3 (E.D.Pa. Nov. 13, 2003)).

Applying the "modest factual showing" standard, a moving plaintiff must demonstrate "a sufficient factual basis on which a reasonable inference could be made that defendant[] orchestrated or implemented a single decision, policy or plan to discriminate against their … employees on the basis of age." *Mueller*, 201 F.R.D. at 429 (quoting *Brooks v. BellSouth Telecommunications, Inc.*, 164 F.R.D. 561, 567 (N.D.Ala. 1995)). The Court need not make a conclusive finding of "similar situations" at the notice stage. *Id.*

## III.    Discussion

Plaintiffs define their proposed collective class as all "employees who were, at any time from on or about March 31, 2009: a) 50 years of age or older; b) Who was employed by PGW; c) A member of the salaried workforce; and d) Terminated from employment with PGW by the RIF implemented on March 31, 2009."[2]  (Docket No. 88 at 1; *see also* Docket No. 54 at ¶ 181).  The Court is called upon to determine whether Plaintiffs have made a sufficient showing to conditionally certify this collective class.  In making this determination, the Court will address several threshold issues before turning to the ultimate question of conditional certification.

### a.    The ADEA Protects Individuals Who Are Forty Years Old and Older

The ADEA protects against discrimination those who are forty years old and older.  *See* 29 U.S.C. § 631 (defining the protected class as "limited to individuals who are at least 40 years of age.").  Plaintiffs have attempted to define their class as a subgroup of this class: they seek to certify a collective action on behalf of those who are fifty years of age or older.  (*See* Docket No. 88 at 1).  Defendant challenges this effort to "slice and dice" the class.  (Docket No. 135 at 1).

Throughout its briefing, Defendant refers this Court to a series of cases in contending that courts have consistently rejected efforts akin to Plaintiffs' request to certify a subgroup under the ADEA.  *See EEOC v. McDonnell Douglas Corp.*, 191 F.3d 948, 950-51 (8th Cir. 1999); *Lowe v. Commack Union Free School Dist.*, 886 F.2d 1364, 1373 (2d Cir. 1989); *Smith v. Tenn. Valley Auth.*, 924 F.2d 1059, *4 (6th Cir. 1991); *Myers v. Del. County Comm. College*, 2007 WL 1322239, at *10, n.1  (E.D.Pa. Mar. 9, 2007); *Schechner v. KPIX-TV*, 2011 WL 109144, at *4

---

[2] Although Plaintiff Csukas was terminated the day before, it appears that those employees terminated on March 30, 2009 were terminated as part of the same RIF, with the implication being that they, too, were subject to the same policy.

(N.D. Cal. Jan. 31, 2011); *Kinnally v. Rogers Corp.*, 2009 WL 597211, at *10 (D. Ariz. Mar. 9, 2009). As the Eighth Circuit recognized:

> We believe that there are stronger reasons for refusing to recognize such claims. For one thing, if such claims [for discrimination against subgroups] were cognizable under the statute, a plaintiff could bring a disparate-impact claim despite the fact that the statistical evidence indicated that an employer's RIF criteria had a very favorable impact upon the entire protected group of employees aged 40 and older, compared to those employees outside the protected group. We do not believe that Congress could have intended such a result.

> We agree, moreover, with the district court that if disparate-impact claims on behalf of subgroups were cognizable under the ADEA, the consequence would be to require an employer engaging in a RIF to attempt what might well be impossible: to achieve statistical parity among the virtually infinite number of age subgroups in its work force. Adoption of such a theory, moreover, might well have the anomalous result of forcing employers to take age into account in making layoff decisions, which is the very sort of age-based decision-making that the statute proscribes.

*McDonnell Douglas Corp.*, 191 F.3d at 951.

Plaintiffs, for their part, urge this Court to find that subgroup discrimination claims may be maintained. Albeit filed in their response to the Defendant's Motion for Summary Judgment,[3] Plaintiffs refer this court to a number of cases which, Plaintiffs argue, supports their position. (*See* Docket No. 123 at 15). Two of those cases are of particular interest. In *Graffam v. Scott Paper Co.*, 848 F.Supp. 1 (D. Me. 1994), the District Court for the District of Maine expressly rejected the reasoning of *Lowe*, *supra*, finding that the *Lowe* rule "deprives older individuals of the protection from discrimination that the Act is meant to provide." *Graffam*, 848 F.Supp. at 4. Likewise, the District of Delaware rejected the *Lowe* analysis, finding a subgroup of those of

---

[3] The parties acknowledge that their arguments overlap as to Plaintiffs' Motion for Conditional Certification (Docket No. 88) and Defendant's Motion for Summary Judgment (Docket No. 101). (*See* Docket No. 176 at 3-4). Because the arguments are related, the Court reads each motion and its related filings as informing the Court's analysis of the other motion.

fifty years of age and older to be appropriate under the statute. *See Finch v. Hercules Inc.*, 865 F.Supp. 1104, 1129 (D. Del. 1994).

Based upon the representations of the parties and this Court's own research, it appears that the issue of subgroup claims under the ADEA has not been addressed by a controlling authority, whether the Third Circuit or Supreme Court.[4] This Court will, therefore, address the matter as one of first impression.

Although this Court acknowledges that the trend has been away from *Graffam* and *Finch*, and towards *McDonnell Douglas*, this Court respectfully disagrees with the conclusions reached in *Lowe* and *McDonnell Douglas*. *Lowe* was concerned with the ability of a plaintiff to subdivide the protected class into infinite subgroups, at least one of which would presumably enable a statistical showing of disparate impact. *See id.* (noting that "an 85 year old plaintiff could seek to prove a discrimination claim by showing that a hiring practice caused a disparate impact on the 'subgroup' of those age 85 and above, even though all those hired were in their late seventies.").

*McDonnell Douglas* arrived at the same conclusion, for slightly different reasons. In that case, the Eighth Circuit observed that, if subgroup claims were allowed, a plaintiff could bring a disparate impact claim despite the fact that statistical evidence might show that an RIF had actually had a favorable impact upon the entire protected group of employees over forty when compared to those employees outside of the protected group. *McDonnell Douglas*, 191 F.3d at

---

[4] The closest either party gets to a "controlling" authority on this question is Defendant's citation to *Myers v. Delaware County Community College*, Civ. No. 05-5855, 2007 WL 1322239 (E.D. Pa. March 9, 2007), at page 6 of their supplemental brief. (Docket No. 135 at 6). *Myers* simply found the *Lowe* decision "persuasive." *See Myers*, 2007 WL 1322239 at *10 n. 1. However, because the Court granted summary judgment in favor of the defendant in that case, it did not thoroughly analyze the question of whether subgroup protection was available under the ADEA. *Id.* Thus, the Court will not rely on *Myers* in its own analysis of the ADEA.

951. Further, the Court noted that an employer might be required to "attempt what might well be impossible: to achieve statistical parity among the virtually infinite number of age subgroups in its work force." *Id.*

As stated, this Court does not agree with the conclusions reached in *Lowe*, *McDonnell Douglas*, or the cases that follow them. The Court will examine the broader context of the ADEA, explaining why it reads the ADEA to allow subgroup classification in disparate impact cases. With this background in mind, the Court will then address the specific concerns raised by *Lowe* and *McDonnell Douglas*.

### i. The ADEA Background and Framework

The ADEA's prohibition covers "discriminat[ion] … because of age." 29 U.S.C. § 623(a)(1). The "prohibitions in [the ADEA] shall be limited to individuals who are at least 40 years of age." 29 U.S.C. § 631(a). Congress, in its findings, makes clear that the ADEA was passed based on the concern that older workers are disadvantaged in the work place. *See* 29 U.S.C. § 621(a)(1)-(4).

In 2004, the Supreme Court examined the history of the ADEA in great detail in *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581 (2004). This Court briefly summarizes some of the most pertinent points. At the outset, age was not included in the discrimination forbidden by Title VII of the Civil Rights Act of 1964, § 715, 78 Stat. 265, as Congress was aware that there were some legitimate reasons, as well as invidious ones, for making employment decisions based on age. *Cline*, 540 U.S. at 586-87. Instead, the Secretary of Labor was called upon to examine the issue. The Secretary determined that older individuals were disadvantaged when compared to younger. Report of the Secretary of Labor, The Older American Worker: Age Discrimination in Employment 2 (June 1965) (hereinafter, Wirtz

Report). Although the Secretary observed disadvantage for older workers, the Wirtz Report "contains *no suggestion that reactions to age level off at some point*, and it was devoid of any indication that the Secretary had noticed unfair advantages accruing to older employees at the expense of their juniors." *Cline*, 540 U.S. at 587 (emphasis added).

During congressional hearings on what would become the ADEA, much was said on the impact of increasing age. *See*, *e.g.*, Age Discrimination in Employment: Hearings on H.R. 3651 *et al.* before the General Subcommittee on Labor of the House Committee on Education and Labor, 90th Congress, 1st Sess. at 151 (1967) (hereinafter House Hearings) (statement of Rep. Joshua Eilberg) ("At age 40, a worker may find that age restrictions become common … By age 45, his employment opportunities are likely to contract sharply; they shrink more severely at age 55 and virtually vanish by age 65"). "The record thus reflects the common facts that an individual's chances to find and keep a job *get worse over time*; as between any two people, the younger is in the stronger position, the older more apt to be tagged with demeaning stereotype." *Cline*, 540 U.S. at 589 (emphasis added). Thus, it "is beyond reasonable doubt, that the ADEA was concerned to protect a *relatively* old worker from discrimination that works to the advantage of the *relatively* young." *Id.* at 590-91 (emphasis added).

The legislative history and the holding in *Cline* make one thing clear: age discrimination does not stop at forty. The older an employee (or potential employee) is, the more likely it is that that person will suffer from age discrimination. *See* House Hearings at 151. This Court sees nothing in the statute that contradicts this conclusion, or that would limit a court's ability to examine in detail any possible disparate impact that may only impact those of more advanced age than 40-year-olds.

Indeed, the Court finds support for the opposite: the statute protects "*individuals* who are *at least* 40 years of age." 29 U.S.C. § 631(a) (emphasis added). The statute, by its plain language, protects anyone who is forty or older. The statute likewise clearly protects against employment decisions made "because of [an] individual's age." 29 U.S.C. § 623(a)(1)-(2). Clearly, a fifty year old is older than forty, and there can be no serious dispute that fifty year olds can be discriminated against on the basis of their age, even when compared to other, younger members of the protected group.

The Court also finds support for the viability of subgroup claims in the Supreme Court's recognition that the "ultimate legal issue" is the same in disparate impact and disparate treatment cases. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988). The Supreme Court has also held that a claim may lie even where a plaintiff fails to establish that he was replaced by someone outside of the protected class. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). Although that case was, admittedly, decided in the context of a disparate treatment claim, the "ultimate legal issue" in that case is the same as in a disparate impact case: that is, whether a *relatively younger* individual – within or outside of the class – was preferred to the plaintiff for no reason other than age. Thus, the distinction between treatment and impact is not persuasive here. *See* Sandra F. Sperino, *The Sky Remains Intact: Why Allowing Subgroup Evidence is Consistent With the Age Discrimination in Employment Act*, 90 MARQ. L. REV. 227, 252-53 (2006) (hereinafter, Sperino) (arguing that the *O'Connor* decision should not be limited to disparate treatment claims). If a lone fifty-five year old can establish a claim for age discrimination, even if he was replaced by a forty-two year old, the Court sees no reason why a group of fifty-five year olds cannot do the same.

This Court finds further support for allowing subgroup claims by looking beyond the confines of the ADEA. Given the similarity of the statutory language, the Supreme Court has looked to, and followed, its reasoning in Title VII cases when analyzing the ADEA. Specifically, the Court followed its Title VII precedent in concluding that the ADEA allowed disparate impact claims.. *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233-35 (2005) (finding that the ADEA provides for disparate impact claims).[5] Taking this reasoning a step further, "[i]t is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of [age] merely because he favorably treats other members of the employees' group." *Connecticut v. Teal*, 457 U.S. 440, 445 (1982). If subgroup claims are cognizable in disparate impact cases under Title VII, in the absence of statutory language that indicates otherwise, they should likewise be cognizable under the ADEA

Of course, just because a subgroup may be defined under the ADEA does not mean that there are no limits upon that definition: the *Cline* decision makes clear that discrimination cannot occur with respect to those that are part of the protected class, but are relatively younger. The focus of *Cline* was a policy which arguably discriminated against those over forty and under fifty. *See Cline*, 540 U.S. at 584. Based on the House Hearings and Wirtz Report, *supra*, among other sources, the Supreme Court determined that such a group was not colorable, as the ADEA does not prohibit favoring the older over the younger. *Id.*

The logical conclusion to be drawn from the *Cline* holding is that no subgroup may be defined with an upper boundary – only a lower one. If, for example, a plaintiff were to attempt

---

[5] The Court recognizes that the *Smith* decision did observe that "the scope of disparate-impact liability under ADEA is narrower than under Title VII." *Smith*, 544 U.S. at 240. The two reasons for this narrower scope are the ADEA's "reasonable factor other than age" provision and the amendments to Title VII contained in the Civil Rights Act of 1991. The Court does not read either of these limitations as affecting the analysis of whether a subgroup claim may be brought.

to define a subgroup of 55-58 year olds, and there were employees over 58 years of age, the underlying argument that must necessarily be assumed is that those employees 59 and over have been treated better than those in the subgroup.[6] This does not accord with *Cline*, and would necessarily fail under the reasoning of that case.

Further, because statistics are valuable in showing disparate impact, the Court notes that the size of a subgroup is practically limited by the boundaries of statistical analysis. The more narrowly a subgroup is defined, the easier it may be to show a disparate impact. Indeed, with a sufficiently narrow and defined subgroup, a case could potentially describe a hypothetical class of one. However, the more narrowly a subgroup is defined, the less likely the statistics derived from that subgroup are to be statistically significant. *See* Sperino, 90 MARQ. L. REV. at 229 ("For many employees, especially those in their sixties or older, it will be impossible to produce subgroup evidence in support of a disparate impact claim because there will simply be too few employees within the protected class to create a statistically significant sample.").[7]

### ii. *Lowe* and *McDonnell Douglas*

With this background in mind, this Court does not find the reasoning applied in *Lowe* or *McDonnell Douglas* to be sufficient to deny plaintiffs the ability to bring subgroup claims under the ADEA, at this stage.

---

[6] If there are no employees older than 58 in this hypothetical, than the subgroup is, for all purposes, a group defined with only a lower limit of 55 years of age. This group would be in accord with *Cline*, as it would compare older to younger, only.

[7] The Court observes that it appears that the average employee age is increasing. By 2016, workers age 65 and over are expected to account for 6.1 percent of the total workforce, which is a sharp increase from the 2006 share of 3.6 percent. *See* Projected growth in labor force participation of seniors, 2006-2016, *available at* http://www.bls.gov/opub/ted/2008/jul/wk4/art04.htm (last visited May 2, 2012). Thus, Professor Sperino's point may not hold true for employees age 65 and older, but it surely holds true at some point in the age spectrum.

The concern in *Lowe* was that a complaining party may be able to pick and choose how to define his subgroup in order to produce statistical evidence that might demonstrate discriminatory impact. *Lowe*, 886 F.2d at 1373. As this Court has described above, there are two factors that mitigate this concern. First, this Court reads the *Cline* decision to prohibit defining an upper cap on a subgroup. Thus, a plaintiff will not be able to whittle down a subgroup from top to bottom and bottom to top in order to achieve the statistical disparity he seeks. Second, even if a plaintiff were to attempt to create a narrowly-restricted subgroup, the limitations of statistical analysis restrict the degree to which a plaintiff might construct his proposed subgroup.

One of the concerns raised in *McDonnell Douglas* is similar, but distinct. The Eighth Circuit's fear was that, if plaintiffs were able to selectively define subgroups, employers would be forced to attempt the "impossible: to achieve statistical parity among the virtually infinite number of age subgroups in its work force." *McDonnell Douglas*, 191 F.3d at 951. This Court believes the same two factors discussed relative to *Lowe* are likewise fatal to *McDonnell Douglas*'s concern over impossibility, and the Court will not repeat itself. Additionally, while an "infinite" number of subgroups is *technically* feasible, as time can be divided into an infinite number of increments, as a practical matter courts will only have to deal with discrete, and rather limited, proposed subgroups. Full years, *i.e.* 52, 56, or 70, are the only likely discrete values that might be used to construct subgroups. Practically speaking, there are only about 30 discrete values – from 40 years old to approximately 70 years – over which courts might see proposed subgroups, as typically, people are approaching retirement by that age, if not sooner.[8]

---

[8] While technically possible, this Court perceives that it is *highly* unlikely that litigants may engage in the child-like practice of subdividing years. For example, PGW points to the possibility of a "creative 'subset,' even one as absurd as ages 45 ½ to 49 ¾." (Docket No. 135 at

Perhaps the most troubling justification for denying subgroup claims is the other problem raised in *McDonnell Douglas*. The Eighth Circuit observed that, in certain circumstances, a subgroup disparate impact claim might stand, even though the entire protected class of employees over forty might have been treated very favorably when compared to those employees outside of the protected group. *Id.* However, as *Cline* makes clear, the ADEA is not concerned with reverse age discrimination. *See Cline*, 540 U.S. at 590-91. Rather, this Court reads *Cline* to yield the proposition that, so long as comparatively older workers are treated less favorably than comparatively younger, but still protected, workers, the impact of a given policy on unprotected workers is irrelevant.

### iii. Plaintiffs May Define a Class as 50 and Over

Given the foregoing discussion, the Court is of the belief that the Plaintiffs may define their collective class as a subgroup of the statutorily-protected class of employees over 40 years of age. This Court sees nothing in the statute that prohibits the rights of employees to do so, and the Court finds no sufficient justification in the non-binding precedent which refutes that conclusion. Instead, the Court finds highly persuasive the reasoning presented in Professor Sperino's article, referenced above. *See generally* Sperino, 90 MARQ. L. REV. 227. The Court will, therefore, accept the collective group, as defined by the Plaintiffs, for purposes of the remaining analysis.

### b. Expert Witnesses at the Conditional Certification Stage

The Court next turns to the parties' dispute over the propriety of this Court's consideration of expert evidence. Plaintiffs, for their part, oppose any use of expert evidence at

---

6). That truly is absurd. One can only imagine a litigant coming to federal court and arguing "Acme Company discriminated against me because I'm *fifty and a half*, and my replacement is only *fifty and a quarter*!" One can also imagine the haste with which a court would dispose of such a case.

this stage of litigation. (Docket No. 113 at 26-29). The gist of their argument, as the Court understands it, is the simple proposition that the Plaintiffs are not required to present expert testimony at the conditional certification stage. They do, however, submit with their reply brief, an expert report in opposition to PGW's. (Docket No. 113-2). Plaintiffs ask that the Court consider this Report "**only if** the Court chooses to accept the Pifer Report as evidence in opposition to conditional certification—which it should not do." (Docket No. 113 at 28).

Defendant responds that consideration of its expert testimony is appropriate precisely for the reasons Plaintiffs claim it is not: that is, that the authority upon which Plaintiffs rely to oppose the use of statistics in this discriminatory impact case discusses the use of statistical evidence in a disparate *treatment* case. (*See* Docket No. 126 at 15) (discussing *Healy v. New York Life Ins. Co.*, 860 F.2d 1209 (3d Cir. 1988)). Defendant also argues that it is inappropriate for Plaintiffs to introduce new evidence in their reply brief, and as a result, the expert evidence submitted therein should be barred for purposes of this motion. (*Id.* at 16).

The Court will first address the propriety of considering the Plaintiffs' newly-raised expert report. "It is improper for the moving party to shift gears and introduce new facts or different legal arguments in the reply brief than [those that were] presented in the moving papers." *D'Aiuto v. City of Jersey City*, Civ. No. 06-6222, 2007 U.S. Dist. LEXIS 57646, at *10, n. 1 (D.N.J. August 8, 2007) (Greenaway, J.) (internal quotations omitted) (quoting William W. Schwarzer, A. Wallace Tashima, and James M. Wagstaffe, FEDERAL CIVIL PROCEDURE BEFORE TRIAL, § 12:107 (The Rutter Group 2005)). "[R]eply briefs are limited in scope to matters either raised by the opposition or unforeseen at the time of the original motion." *Burnham v. City of Rohnert Park*, No. C 92-1439, 1992 WL 672965, *5 (N.D. Cal. May 18, 1992). Plaintiffs twice alluded to statistical evidence, but failed to produce any expert report or

otherwise brief the issue.[9]  Thus, the Plaintiffs were clearly aware of the potential for statistical evidence, and as such, it cannot be considered unforeseen.  In this regard, it would be improper for Plaintiffs to introduce expert evidence that could otherwise have been raised in its opening brief.

That is not to say that Plaintiffs' report could not be raised as rebuttal evidence. "Whether to permit or prohibit the introduction of rebuttal evidence is committed to the sound discretion of the trial court." *Jackson v. City of Pittsburgh*, Civ. No. 07-111, 2011 WL 3443951, *15 (W.D. Pa. Aug. 8, 2011) (citing Fed.R.Evid. 611(a); *Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 190 (3d Cir. 1990) ("a trial judge's decision regarding the scope of rebuttal may not be reversed unless there has been a clear abuse of discretion.")).  "Rebuttal evidence must generally tend to refute the defendant's proof," *Bhaya*, 922 F.2d at 190, and "is not to be used as a continuation of the case-in-chief." *Cates v. Sears Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir. 1991).  Moreover, "[o]nce a plaintiff has had a chance to prove a fact, he cannot reopen the matter simply by stating that he wishes to introduce more or better evidence." *Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1, 2 (1st Cir. 1983).  Thus, it would be within the Court's discretion to consider Plaintiffs' expert evidence in rebuttal.  However, as the Court explains

---

[9] The extent of Plaintiff's reference to statistical evidence is contained on pages 9 and 13 of their Brief in Support of their Motion for Conditional Class Certification.  (Docket No. 91).  Page 9 states only that the "standard-less evaluation practice resulted in the termination of approximately 105 employees, 54.3 percent of whom were over 50." (Docket No. 91 at 9).  Page 13 contains slightly more detail:

> Just considering the 105 or so employees terminated, it is easily discernible that the impact was largely borne by the older workers, with those over 50 being especially hard hit. The percentage of employees who were 40 and older who were terminated was 80 percent, and the percentage of employees who were 50 and older who were terminated was 54.3 percent.  (*Id.* at 13).

These "passing reference[s]" are insufficient, without more, to preserve the argument for later.  *See Laborers' Intern.*, 26 F.3d at 398.

below, it does not see a compelling reason to give great consideration to expert evidence from either side of this dispute at this stage in the proceedings.

Defendant avoids the issues just addressed because its expert report was filed contemporaneously with its responsive brief. This report is directed largely to the merits of the Plaintiffs' claims of discrimination. It describes the percentages of those employees retained and terminated (*see, e.g.*, Docket No. 104-20 at ¶¶ 22-25 (examining Plaintiffs' brief references to age statistics and stating that the affidavit "focuses on whether []differences between those PGW salaried employees terminated and those retained are statistically significant for each alternative protected class and for alternative categories of PGW salaries employees.")), with little reference made to whether the proposed members were similarly situated to the named Plaintiffs.

 The Court may consider only admissible evidence in deciding a motion to conditionally certify a collective action. *See, e.g.*, *Wright v. Lehigh Valley Hospital*, Civ. No. 10-431, 2010 WL 3363992, *4 (E.D.Pa. Aug. 24, 2010); *Kuznyetsov v. West Penn Allegheny Health System, Inc.*, Civ. No. 09-379, 2009 WL 1515175, *4 (W.D.Pa. June 1, 2009) (Ambrose, J.); *Stanislaw v. Erie Indem. Co.*, Civ. No. 07-1078, 2009 WL 426641, *2 (W.D.Pa. Feb. 20, 2009). While these cases are useful, they are not entirely dispositive, as there is no indication that Defendant's expert report would be inadmissible. So, the Court's analysis must go a step further.

The thrust of the Court's inquiry at this juncture – i.e., at the conditional certification stage – "is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are 'similarly situated' under 29 U.S.C. § 216(B) with respect to their allegations that the law has been violated." *Young v. Cooper Cameron Corp.*, 229 F.R.D. 50, 54 (S.D.N.Y. 2005) (citing *Krueger v. N.Y. Tel. Co.*, Civ. Nos. 93-178, 93-179, 1993 WL 276058, *2 (S.D.N.Y. July 21, 1993) ("[T]he Court need not evaluate the merits of plaintiff's claims in

order to determine whether a 'similarly situated' group exists."); *see also Owens v. Bethlehem Mines Corp.*, 108 F.R.D. 207, 210-211 (S.D.W. Va. 1985) ("[A]t this point the Plaintiff does not have to prove that there was a class of employees which was subjected to discrimination by [the defendant]. This … is the ultimate question. The Plaintiff only has to show that a group of employees similarly situated to one another are claiming discrimination."). The analysis here is not directed to whether the plaintiffs will succeed in their claim; rather, the purpose of the analysis is to "establish[] nothing more than the right of the plaintiffs to 'maintain' a collective action." *Sperling v. Hoffman-La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988) ("*Sperling III*").

Although these cases are not controlling, they are entirely consistent with the Third Circuit's admonition that, "[d]uring the initial phase, the court makes a preliminary determination whether the employees enumerated in the complaint can be provisionally categorized as similarly situated to the named plaintiff." *Symczyk*, 656 F.3d at 192. Under the "modest factual showing" standard, the movant must produce some evidence "of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." *Id.* at 193. Nothing in the case law, to this Court's reading, requires a trial court to engage in a determination on the legal merits of the underlying discrimination claim at the conditional certification stage.

Given that the Court is not examining the legal merits of the Plaintiffs' claims here, the Court finds that the Defendant's expert report is not dispositive with respect to the instant motion. Defendant's report is directed to statistical evidence of *discrimination*, not the element of similar situation. In his own words, Defendant's expert "ha[s] been instructed … to review, comment on and analyze the statistical significance, if any, *of the alleged age discrimination*

*claim* by Plaintiffs *within their proposed protected class* of PGW salaried employees." (Docket No. 104-20 at ¶ 12) (emphasis added). "The fundamental issue discussed herein is whether there is any statistical evidence of age discrimination during PGW's reduction in force of its salaried employees on or about 31 March 2009." (*Id.* at ¶ 16). The report speaks to the merits of the discrimination case, not the motion presently before the Court. Hence, the report is not instrumental in the Court's decision to conditionally certify this case.

### c. Conditional Certification

Having decided that the Plaintiffs' proposed subgroup class claim is cognizable under the ADEA, and that the proposed expert evidence as to discrimination does not dictate the outcome of the similar situation analysis, the Court now turns to the merits of the motion for conditional certification. To qualify for conditional certification, Plaintiffs need only make out a "modest factual showing", *Symczyk*, 656 F.3d at 192-93, that they are similarly situated to other members of the proposed class. To this end, the Court must determine whether the Plaintiffs have demonstrated "a sufficient factual basis on which a reasonable inference could be made that defendant[] orchestrated or implemented a single decision, policy or plan to discriminate against [its] … employees on the basis of age." *Mueller*, 201 F.R.D. at 429 (citing *Brooks*, 164 F.R.D. at 567).

Defendant argues that, even if the Plaintiffs show that they (and their proposed class members) were victims of a single decision, policy or plan, they "must further show that the putative class members: (1) were employed in the same corporate department, division and location; (2) advance similar claims; and (3) seek substantially the same form of relief." (Docket No. 106 at 24 (citing *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 51 (3d Cir. 1989), overruled on other grounds, *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1099 n.10 (3d

Cir. 1995))). This Court, however, does not read *Lockhart* as requiring affirmative showings of these factors, as the Court of Appeals merely cited with approval a lower court's analysis of those factors. *See Lockhart*, 879 F.2d at 51. Indeed, the paragraph following the one cited by the Defendants proves the point: the Court of Appeals concluded that the opt-in plaintiffs in that action were "similarly situated" despite being employed in different branch locations. *Id.* ("The opt-in plaintiffs in the present action were all former employees within the Financial Services Division of WCC, *albeit in different branch locations*… Balancing the factors as applied in *Plummer* and *Lusardi*, we conclude that all the opt-in plaintiffs in this present action were 'similarly situated' to Lockhart.") (emphasis added).

All said, courts have examined a number of factors in the conditional certification analysis. These factors are summarized well in *Wynn v. National Broadcasting Co., Inc.*, 234 F. Supp. 2d 1067, 1082-84 (C.D. Cal. 2002), which cites a number of other cases that have addressed similarity. The first is *Lusardi v. Xerox Corp.*, which looked to "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to Xerox which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." *Lusardi*, 118 F.R.D. 351, 359 (D.N.J. 1987). Other factors include: (1) whether the plaintiffs all held the same job titles; (2) whether the plaintiffs worked in different geographical locations; (3) the extent to which the claimed discrimination occurs during different time periods and by different decision-makers; (4) whether plaintiffs have provided "statistically significant" evidence of age discrimination; (5) whether the plaintiffs all alleged similar, though not identical, discriminatory treatment; (6) whether the plaintiffs have sufficiently pled and supported by affidavits, depositions, and the like that defendant's decision-makers have articulated and manifested a clear intent to purge the defendant of older employees; and (7)

whether the defendant took steps to implement its plan, such as by targeting older employees for criticism and building a "paper trail" that would be grounds for their demotion. *Wynn*, 234 F. Supp. 2d at 1083.

A brief review of some of the cases cited by *Wynn* is informative. The facts in *Hyman v. First Union Corporation*, 982 F. Supp. 1 (D.D.C. 1997), demonstrate the type of evidence that speaks to similarity. That case involved terminations "during two RIFs in a span of six months" after one entity was acquired by another. *Hyman*, 982 F. Supp. at 4-5. Although the plaintiffs in *Hyman* acknowledged that "individual managers did have discretion when deciding whom to retain," they argued that a few central individuals were responsible for the ultimate discrimination. *Id.* at 4. "Weighing very strongly in favor of a collective action is the fact that the challenged employment practice, termination, is the same for each of the members." *Id.* Finally, the *Hyman* Court weighed heavily in favor of conditional certification the fact that common evidence would be used to prove the alleged discrimination. *Id.* at 5.

*Lusardi* involved "various work force reductions." 118 F.R.D. at 352. The proposed class in that case was derived from a wide range of suborganizations and subsidiaries and involved different jobs. *Id.* The proposed class members were subject to different job actions, "including resignations, promotions, terminations for cause, etc.", and "which occurred at various times as a result of decisions by different supervisors made on a decentralized employee-by-employee basis." *Id.* Indeed, the terminations at issue occurred over twenty-eight voluntary RIFs or forty-seven involuntary RIFs that occurred over a four year period. *Id.* at 361. On the basis of these differences, the motion was denied.

The *Wynn* case itself presents a different set of facts which resulted in a denial. That case addressed "an unprecedented move": "combining the decisions of several loosely-related

entities, under an umbrella of a common industry-wide practice." *Wynn*, 234 F. Supp. 2d at 1083. The plaintiffs – former or current television writers – were from "various states and Canada," and they claimed different backgrounds "in terms of qualifications and experience." *Id.* at 1074. Some plaintiffs had not worked for nearly twenty years, while others had obtained work in the years leading up to the filing of the lawsuit. *Id.* Even so, the Court recognized that "it would appear that Plaintiffs have done all that is required of them up to this point. Were they to proceed in a class action against *any one employer*, … the class would most likely be conditionally certified." *Id.* at 1084.

After review of these cases, considering the facts of the pending case, the Court concludes that Plaintiffs' request for conditional certification should be granted. Although the instant facts are not identical to any set of facts in the cases addressed above, or any other that the Court has found, the Court believes this case has much more in common with *Hyman* than it does *Lusardi*.

First, the Court looks to the activities of the Defendant. Plaintiffs have demonstrated that they were all terminated in the course of a single, company-wide RIF. This RIF clearly constitutes a "single decision, policy or plan," even if it was implemented by individual managers. Further, the named Plaintiffs were all over 50 years old when they were terminated from PGW. Despite what appears to be the common practice of allowing qualified workers to apply for alternative positions when theirs are at risk,[10] Mr. Karlo was expressly denied that

---

[10] PPG's October 30, 2000 RIF Guidelines make clear that that entity allowed the practice of "bumping," where a satisfactory worker whose position was eliminated would "displace" a worker who received "needs improvement" ratings. (Docket No. 88-4 at 3). Likewise, Mr. Cooney indicated at his deposition that his former employer, Whirlpool, had a similar policy in place, where it "made sure that [displaced employees] were made aware of" alternative positions in the company. (Docket No. 88-5 at 11-13). While this evidence does not appear relevant to the question of PGW's alleged discrimination, the Court observes that the evidence does indicate

opportunity. (*See* Docket No. 88-6 at 11-12). The evidence also hints that "adaptability," potentially a proxy for age,[11] was a factor considered in the RIF. (*Id.* at 12-13). Combined with the lack of any documentation about the RIF,[12] this Court finds that PGW's activities weigh in favor of certification. Importantly, the fact that the decision to implement the RIF was made at a high level of the organization weighs in favor of a broader class. *See Owens*, 108 F.R.D. at 212 ("It is the nature of a reduction in force which makes the broader class definition appropriate.").

As to the actual similarities between members of the proposed class, this Court agrees with *Hyman*'s reasoning that termination via the same RIF "weigh[s] very strongly in favor of a collective action." *Hyman*, 982 F. Supp. at 4. Unlike *Lusardi*, which involved a large number of localized RIFs that occurred over an extended period, the actions complained of in this case all arose under a single, company-wide RIF. Although the *Hyman* plaintiffs "all come from a discrete geographical area," *id.*, this Court finds that the high-level decision to implement a company-wide RIF outweighs the geographic dispersion of the proposed class members. A

---

that other firms typically look to give qualified displaced employees other opportunities within the company before termination. The record demonstrates that there were no guidelines in place at PGW when the 2009 RIF occurred. (*See generally* Docket No. 88-5).

[11] *See, e.g.*, *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 352 (5th Cir. 2005); *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1507 (5th Cir. 1988). *Cf. Robinson v. Union Carbide Corp.*, 538 F.2d 652, 662 (5th Cir. 1976) (observing that subjects like "adaptability" may "subject[] the ultimate promotion decision to the intolerable occurrence of conscious or unconscious prejudice.").

[12] The Court recognizes and accepts the Defendant's argument that a "lack of consideration of historical performance data and HR oversight, and failure to use a predecessor company's (PPG's) RIF guidelines do not alone establish that any individual or group of individuals was discriminated against." (Docket No. 126 at 11 (citing *Marione v. Metro Life Ins. Co.*, 188 Fed. App'x 141 (3d Cir. 2006)). However, a lack of guidelines, in conjunction with statements like those of Mr. Cannon, who evidently claimed that his decision was driven by "adaptability" (*see* Docket No. 88-6 at 12-13), might give rise to an inference of ageism. The Court does not draw that conclusion here, but emphasizes that such an inference may be drawn based on the evidence.

single decision, made high enough in the company, may have implications that reach far beyond a narrow geographic location.

Finally, the Court observes that the proposed class members will rely on common evidence to prove their alleged discrimination. This, too, weighs in favor of conditional certification. *See id.* at 5.

Because this Court is convinced that the Plaintiffs have made an adequate showing of similarity to surpass the relatively low hurdle of conditional certification, the Court will grant leave to pursue the collective action. However, the Court notes that this does not mean Plaintiffs have satisfied the ultimate burden they will face in achieving certification of this representative action. *See Symczyk*, 656 F.3d at 194 ("[T]he certification we refer to here is only the district court's exercise of [its] discretionary power, upheld in *Hoffman-La Roche*, to facilitate the sending of notice to potential class members and is neither necessary nor sufficient for the existence of a representative action under the [ADEA].") (internal quotations omitted) (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 555 n. 10 (2d Cir. 2010)). At present, the evidence is far from sufficient to carry the final burden.

### d. PGW's *Wal-Mart* Argument

Because it raises an important question, the Court also addresses PGW's argument that the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011), should lead to a denial of Plaintiffs' motion for conditional certification. In their opening brief, the Plaintiffs argue that *Wal-Mart* is irrelevant to this case, as it was decided under Rule 23, and not the collective action mechanism. (Docket No. 91 at 29-30). They also note that their proposed class is dramatically different from the mammoth class in *Wal-Mart*. (*Id.* at 30-31). PGW argues that the *Wal-Mart* holding is instructive here, and points the Court to several cases that

PGW claims support that proposition. (*See* Docket No. 106 at 22-23 (citing *Ruiz v. Serco, Inc.*, Civ. No. 10-394, 2011 WL 7138732, *6 (W.D. Wis. Aug. 5, 2011); *MacGregor v. Farmers Ins. Exch.*, Civ. No. 10-3088, 2011 WL 2981466, *4 (D.S.C. July 22, 2011)).

To the extent that these cases describe *Wal-Mart* as "instructive", *Ruiz*, 2011 WL 7138732 at *6, or "illuminating," *MacGregor*, 2011 WL 2981466 at *4, with respect to collective actions, this Court agrees. However, the Court does not believe that application of *Wal-Mart* would render the class uncertifiable.[13] First, *Wal-Mart* is factually quite different from the present case. At issue in that case were pay and promotion decisions made with respect to more than 1.5 million class members. *Wal-Mart*, 131 S.Ct. at 2547. It appears that each one of these decisions occurred independently, over the course of several years. *See id.* at 2549 (defining the class as all women employed "since December 26, 1998"). The numerosity and dispersion of the *Wal-Mart* class makes it look more like *Wynn*, 234 F. Supp. 2d 1067, *supra*, than the instant case.

Second, there is language in the *Wal-Mart* case itself that indicates that conditional certification is appropriate in this case. The Court observed that:

> What matters to class certification … is not the raising of common "questions"—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Wal-Mart*, 131 S.Ct. at 2551 (emphasis in original, internal citation omitted). The Court's tentative finding that the parties are similarly situated is an indication that it believes that a

---

[13] The Court is not aware of any case within this Circuit on the point, and emphasizes that it *does not* decide, at this juncture, whether the reasoning in *Wal-Mart* is necessarily to be applied to collective actions in the ADEA. Rather, the Court simply observes that, on the record before it, *even if Wal-Mart* was applicable, it would not lead this Court to conclude that conditional certification should be denied.

common *answer* will be found to the question of whether discrimination lies at the root of the March 2009 RIF implemented by PGW or not. At the decertification stage, the Court should have more evidence with which to determine whether the dissimilarities between putative class members will impede the generation of common answers or not.

Thus, while the Court does believe that the reasoning in *Wal-Mart* is instructive in collective action context, the Court is not persuaded that following *Wal-Mart* would result in the denial of conditional certification here. Instead, the Court believes that the standard two-tiered process is actually on all fours with the *Wal-Mart* decision. This conclusion is bolstered by the *Symczyk* decision, which was decided after – and cited, albeit for a different proposition – the *Wal-Mart* decision. *See Symczyk*, 656 F.3d at 198 n. 10.

### e. Court-Facilitated Notice

Under *Sperling*, this Court has the authority to facilitate notice to putative opt-in plaintiffs. *Sperling*, 493 U.S. at 169. However, this Court, in its Amended Case Management Order (Docket No. 83) ordered the parties to meet and confer regarding the opt-in notice and consent forms, "which shall be made ready for the Court's review upon the Court's ruling on certification, at which time the Court will convene a status conference to review same." (*Id.* at ¶ 5). As PGW argues, based on the Court's Order, Plaintiffs' request for approval of notice was premature. (*See* Docket No. 106 at 35). PGW informed the Court in its brief that there is only "one discrete matter" to address, (*id.*), so the Court now directs counsel to the parties to finalize the notice and consent forms and present them to the Court for its review.

Finally, there is some dispute over whether Defendant must provide Plaintiffs with contact information for the prospective class members. On that question, the Court finds that it is appropriate for Defendant to produce the same. *See Sperling III*, 118 F.R.D. at 404 (requiring

the defendant to comply with plaintiffs' request for discovery of names and addresses). Despite Defendant's claims that it has "already provide[d] Plaintiffs with much of the requested information," (*id.*), the Court will require that Defendant produce the names and addresses of all potential class members to ensure that no relevant names are omitted.

**IV.     Conclusion**

For the foregoing reasons, Plaintiffs' Motion for Conditional Certification (Docket No. 88) is GRANTED, in part. The Court will convene a status conference to address any remaining notice issues once the Court receives the parties' status reports and proposed notice and consent forms, as directed in the forthcoming Order. Said appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: May 9, 2012

cc/ecf: All counsel of record.