# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RUDOLPH A. KARLO, MARK K. MCLURE, WILLIAM S. CUNNINGHAM, JEFFREY MARIETTI, DAVID MEIXELSBERGER, BENJAMIN D. THOMPSON and RICHARD CSUKAS**, *on behalf of themselves and all others similarly situated*,[1] <br><br> **Plaintiffs,** <br><br> **vs.** <br><br> **PITTSBURGH GLASS WORKS, LLC,** <br><br> **Defendant.** | ) ) ) ) **2:10-cv-1283** ) ) ) ) ) ) ) ) ) ) |

## MEMORANDUM OPINION AND ORDER OF COURT

Pending before the Court is a MOTION FOR DECERTIFICATION OF THE PROPOSED COLLECTIVE ACTION (ECF No. 288) filed by Defendant Pittsburgh Glass Works, LLC ("PGW" or "Defendant") with a redacted (ECF No. 289) and a sealed (ECF No. 293) brief in support. Plaintiffs filed a brief in opposition (ECF No. 300); PGW filed a reply (ECF No. 307); and Plaintiffs filed a surreply (ECF No. 315). The factual record with regard to this motion has been thoroughly developed via the submission of PGW's redacted (ECF No. 290) and sealed (ECF No. 294) statement of facts and accompanying exhibits; and Plaintiffs' numerous appendices and attached exhibits. The Court heard oral argument on September 10, 2013. (ECF No. 342). Afterward, Plaintiffs filed a post-argument brief (ECF No. 337) with leave of Court (ECF No. 338); and PGW filed a memorandum in response (ECF No. 341) with leave of Court (ECF No. 340).

---

1. As discussed in greater detail below, Representative Thompson and Csukas have settled their claims in this action. On July 1, 2013, counsel indicated that he would file a motion to amend the caption to reflect the settlements. (ECF No. 292 at 10). Plaintiffs filed a Renewed Motion for Leave to File Second Amended Complaint (ECF No. 299) on July 15, 2013, which PGW opposes in part (ECF No. 308). This Memorandum Opinion is dispositive of that motion.

The Court also has the following six motions pending in this matter:

(1) PLAINTIFFS' RENEWED MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT (ECF No. 299) in which they incorporate by reference their earlier briefs in support of their prior motion for leave to amend (ECF Nos. 251, 255) and which PGW opposes (ECF No. 308);

(2) DEFENDANT'S MOTION TO BAR PROPOSED EXPERT TESTIMONY OF ANTHONY G. GREENWALD RELATED TO PURPORTED IMPLICIT SOCIAL BIAS (ECF No. 316);

(3) DEFENDANT'S MOTION TO BAR DR. CAMPION'S EXPERT OPINION ON REASONABLE HUMAN RESOURCE PRACTICES (ECF No. 317);

(4) DEFENDANT'S MOTION TO BAR DR. MICHAEL CAMPION'S STATISTICAL ANALYSIS (ECF Nos. 318, 321);

(5) DEFENDANT'S MOTION TO BAR EXPERT OPINION OF DAVID DUFFUS REGARDING THE O'DONOGHUE EXPERT REPORT (ECF Nos. 319, 322); and

(6) PLAINTIFFS' MOTION TO STRIKE MOTIONS TO BAR EXPERT TESTIMONY (ECF Nos. 323, 324) which PGW opposes (ECF No. 333); Plaintiffs have filed a reply brief (ECF No. 336).

The issues have been fully briefed and well-argued on behalf of the parties. Accordingly, the motions are ripe for disposition.

For the reasons that follow, the Court will grant in part and deny in part PGW's motion for decertification; grant in part and deny in part Plaintiffs' renewed motion for leave; and deny as moot and without prejudice Defendant's expert challenges and Plaintiffs' motion to strike the motions to bar expert testimony.

## I.      Background

This case arises from the March 2009 reduction in force ("RIF") by PGW which resulted in the termination of approximately one-hundred of its salaried employees.  The gravamen of the First Amended Complaint is that the terminations were the result of age discrimination.

Plaintiffs Rudolph A. Karlo, Mark K. McLure, William S. Cunningham, Jeffrey Marietti, David Meixelsberger, Benjamin D. Thompson, and Richard Csukas (the "Representative Plaintiffs") initiated this action against PGW on behalf of themselves and all others similarly situated.  Eleven individuals were later permitted to opt-in to this lawsuit: Michael Breen, Matthew Clawson, Colleen Conway, John DeAngelis, Robert Diaz, Charles Fellabaum, Paul Marcelonis, Stephen Shaw, John Titus, Charles Voetzel, and Ronald Wickire (the "Opt-in Plaintiffs").  Of those eighteen party-plaintiffs, nine remain in this litigation: Representative Plaintiffs Karlo, McLure, Cunningham, Marietti, and Meixelsberger; and Opt-in Plaintiffs Breen, Clawson, Shaw, and Titus.

### A.      Factual Background

The following background is taken from the Court's independent review of the motions, the filings in support and opposition thereto, and the record as a whole.[2]

#### 1.  The Formation and Corporate Structure of PGW

PGW was formed on October 1, 2008 from PPG Industries, Inc.'s ("PPG") auto-glass assets.  PPG initially retained a forty-percent ownership in PGW; Kohlberg & Company ("Kohlberg"), a private equity firm, owned the remaining sixty-percent and later acquired the remainder of PPG's interest in the venture.  James Wiggins, a Kohlberg principal, was named

---

2.  The United States Court of Appeals for the Third Circuit has noted that the certification analysis does not require a court to recite the facts as set forth by the plaintiff(s); however, it has done so "to demonstrate that, even reciting the facts to Plaintiffs' benefit, [they] are unable to meet their burden for certification."  *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 538 n.7 (3d Cir. 2012).

Chairman and CEO of PGW.[3]  Unless otherwise noted, the remaining PGW employees transitioned from PPG to PGW.

One of PGW's core businesses is the production of automotive glass to car and truck manufacturers as an original equipment manufacturer ("OEM").  Aside from OEM, PGW consists of GTS Services, a software business ("GTS"); PGW Auto Glass ("AG"), an automotive-replacement-glass distribution business ("ARG"); LYNX Services, an insurance claims administrator ("LYNX"); and Aquapel, a glass treatment supplier.  At a corporate level in Pittsburgh, Pennsylvnia, PGW's business share departments for finance, IT, and Human Resources, functions previously filled by PPG and provided to PGW by contract during a transition period.

Each business is comprised of additional stand-alone operations.  PGW operates the ARG business, run by President Marc Talbert, through a nationwide network of approximately ninety branch facilities, each of which employs truck drivers, managers, and other support staff.  Those branches rely on customer service representatives employed by PGW at centralized call centers in Irving, Texas and Ft. Myers, Florida.  LYNX, headed by General Manger Gary Eilers and Director of Service Solutions John Wysseier, provides outsourced insurance cell-center operations to insurance companies from its base of operations in Ft. Myers and another location in Paducah, Kentucky.  Most of its employees work as customer service representatives.  GTS provides software products and services to glass manufacturers and retailers from a single facility in Portland, Oregon.  Most of it employees are programmers and developers.

---

3.  Wiggins did not perform any formal demographic assessment of PGW's employees when he came aboard, but recognized that the company had an older workforce.  *See* Dep. of Wiggins, ECF No. 301-2 at 3-4 ("Q. Did you perceive that the company had an aging workforce?  A. Yes.  So that was obvious.  Q. When you say it was obvious, why was it obvious to you?  A. Well, I think, although we never did any particular analysis of the ages, I mean we had a senior work force.  You could see that just from the people that you came in contact with.  Q. Did that present any challenges?  A. No.  I think primarily it was a benefit.  Long-standing experience and capabilities.").

## 2. The Decline of the Automobile Industry[4]

Around the time that PGW was formed, General Motors, Ford, and Chrysler (the North American "Big Three") appeared before the United States Congress to request bailout funds. Given the direction of the industry and economic forecast, PGW took several steps to combat deteriorating sales: it closed two manufacturing facilities in Canada and another in Evart, Michigan; consolidated distribution systems; identified about $100-$200 million of necessary capital expenditures; reconfigured its distribution strategy; commenced process improvement actions; and undertook supply chain optimization. PGW also terminated the employment of roughly ten to twelve percent of its salaried workforce in early December 2008. The decision for this RIF—not the subject of this litigation—was made by Wiggins in consultation with his leadership team, forty-five to fifty persons in senior management positions at PGW. The decisions regarding which positions to eliminate were, however, left to the discretion of the individual directors who were assigned a targeted percentage by which they had to reduce their workforce.

PGW undertook several additional measures in early 2009 to meet the challenges of lower demand: it put hourly employees on temporary layoff; it operated its largest plant only four of the thirteen weeks in the first quarter; it trained leadership at each plant in Lean Six Sigma principles; it suspended merit salary increases; it implemented a hiring freeze except for critical positions; it suspended a 401k matching contribution program and bonuses; and cut salaries company-wide.

---

4. Plaintiffs take issue with PGW's "Statement of Facts," including its "purported economic justifications for doing the RIF." *See* Pls.' Br. in Opp. at 2 nn.1, 3. ("Plaintiffs [ ] do not dispute that adverse economic conditions may have justified some reduction in the work force, in some form. Rather, the issue is whether the RIF was carried out in a discriminatory manner."). The Court finds that the record supports PGW's recitation of the adverse economic conditions at the relevant time but expresses no view on whether the RIF disparately impacted older workers or whether they were disparately treated.

### 3.  The March 2009 RIF

Kevin Cooney became Acting HR Director for PGW after the then-Vice President of Human Resources resigned from the company sometime in late-2008 or early-2009.[5]  Around mid-February 2009, Wiggins asked Cooney to take a "fresh look" at the organization and formulate a reorganization plan.

Cooney enlisted the assistance of a consultant, Ed Dunn, an organizational specialist to make recommendations regarding the restructuring of the company into a more lean and effective organization.  Dunn later prepared an "Organization Assessment" presentation and a summary of his observations/recommendations, which Cooney reviewed before they were finalized.  *See* Mem. from Dunn to Cooney, ECF No. 303-5.  In his memorandum, Dunn noted that "[m]arket conditions continue to deteriorate and more cost reductions are required as soon as possible[,] and this would include certain organization changes;" that "[i]t would not be efficient or effective at this time to undertake a formal or time-consuming organization study or process;" and that "[i]nstead, the Executive Team . . . would do an ASAP organization assessment and identify cost-saving organization structure changes to be made that are in addition to the changes and reductions already identified."  *Id.* at 3.  *See also id.* ("The mindset needs to be: Be bold and aggressive.  Risk going too far, too fast . . . verses the opposite.  We can revisit and re-load as needed when conditions and results improve.") (ellipses in original).  These suggestions were not binding on PGW, and Dunn had no role in the decision-making process or implementation of later reductions.

---

5.  The record is somewhat unclear as to when Cooney assumed his interim role, but it appears that he was only involved in the March 2009 RIF and not the December 2008 RIF.  *See* Dep. of Cooney, ECF No. 301-1 at 4-5; Dep. of Wiggins, ECF No. 301-2 at 5-6; *see also* Dep. of Cooney, ECF No. 88-5 at 4.  Robert McCullough permanently filled the position in September 2009.

By early-March 2009, PGW decided to conduct another RIF.  *See generally* Dep. of Cooney, ECF No. 301-1 at 7 ("THE WITNESS: [I]t became clear that the target was going to be about a 30-percent reduction in jobs, not people, but jobs. . . . And it was to – to [Wiggins'] explanation was that, you know, that business was off 30 percent, plants, we're going to lose 30 percent of our plants and so forth.").  Although this decision was made by Wiggins and upper management, the employees were again selected for termination on a decentralized basis.

More specifically, upper management relied on the individual directors of each functional unit to identify the work that needed to be done and the personnel that were necessary to perform that work.  As Cooney recounted,

> [t]he instructions were, what Jim Wiggins said is that we want to have an organization that we can, you know, it's going to be a small organization, but it's got to be one that we can do the work that must be done.  So you get the best people that you can get, the people with the most experience and the breadth of experience and education and so forth to - - to populate the company.

Dep. of Cooney, ECF No. 301-1 at 9.  Cooney likewise cited "[e]ducation, background, breadth of experience, and so forth" when asked what the "general criteria" were in selecting employees for the RIF.  *See id.* at 17.

PGW did not specifically train its directors with regard to the RIF or employ any written guidelines or policies as to how they were to conduct the RIF.  The upper management instead issued a generalized directive for each department to cut a targeted percentage from their budget, a downsizing with which each unit director had to comply.  *See, e.g.*, Dep. of Keith Holmes, [Plant Manager at the Evansville plant], ECF No. 290-13 at 6-7 ("Q. You were just told, essentially, you need to find a way to cut out 20 percent in SG&A [Sales, General and Administration] cost.  A. That's generically the truth.  That's exactly where we were, and how we got that done was sort of up to us.  But you can only cut so many paper clips and different

things before you, obviously, have to get to more meat of the issue . . . . Q. Who gave you that direction that you needed to cut 20 percent? Was that Mr. Stas [the then-Executive Vice President of Operations and COO at PGW] or Mr. Wiggins or both of them? A. That information came through Mr. Stas to me."); Decl. of David King [the then-Director of Enterprise Excellence & Quality], ECF No. 290-39 at 3 ("¶ 9. I did not receive any specific direction from upper management regarding any individual employees who should be terminated, but did determine that I would need to include headcount reductions to achieve the necessary savings."); Dep. of Mark Bulger, ECF No. 301-4 at 3-4 ("Q. Were you given any RIF guidelines for the March, 2009, RIF? A. No. The only instruction I received was we had to reduce one person that was under my supervision."). Thus, the unit directors in the company were afforded broad discretion in determining which of their reports to select for the RIF. *See generally* Decl. of Joseph Stas, ECF No. 290-2.

On March 31, 2009, PGW terminated approximately one-hundred salaried employees. This RIF affected over forty locations and/or divisions of PGW, including the sites in the OEM, ARG, and LYNX businesses at which the nine remaining party-plaintiffs worked. Moreover, as PGW highlights, the RIF impacted almost every part of the company with the widespread job cuts: forty-four from ARG at over twenty locations; twenty-four from OEM including individuals from Creighton, Pennsylvania, Crestline, Ohio, Evansville, Indiana Tipton, Pennsylvania and O'Fallon, Missouri plus seven from Manufacturing Technology, one from Satellite Engineering, and two from Enterprise Excellence; thirteen from ARG Truckload & Services; eight from the company's sales organization; and one from New Product Development. *See* PGW's Br., ECF Nos. 289 at 4. PGW also closed the Evart, Michigan plant on March 31, 2009, leading to the elimination of eighteen salaried employees.

As part of the RIF, a Human Resources employee of PGW with a long tenure at PPG, Diana Jaden, was tasked by Cooney to consolidate data from various locations and unit managers, calculate the amount of severance, identify those who were impacted, and prepare paperwork for the exit interviews. The paperwork included a cover letter that explained that the individual was being terminated and outlined the severance being offered; a "Separation Agreement and Release" that employees could sign to receive certain benefits in exchange for waiving their right to bring a claim against PGW; and two multipage documents with Decisional Unit Matrices ("DUMs") per the Older Workers' Benefit Protection Act ("OWBPA").[6] *See* Def.'s Answer to First Am. Compl., ECF Nos. 73-1; 73-2; 73-9.

### 4. The Terminations of the Remaining Party-Plaintiffs

Relevant here, six unit managers across five locations made the decisions to include the nine remaining party-plaintiffs in the RIF: Gary Cannon, Jason Skeen, Keith Holmes, Gary Eilers, John Wysseier, and Todd Fencak.[7]

#### a. Cannon (Karlo, McLure, Cunningham, Marietti & Meixelsberger)

In early 2009, Cannon was the Director of Manufacturing Technology for PGW's Manufacturing Glass Technology Department ("Manufacturing Technology") in Harmarville, Pennsylvania at which the five remaining Representative Plaintiffs worked. *See* PowerPoint Presentation − Operations Organization Restructuring March 2009, Revised 3/25/09, ECF No.

---

6. Plaintiffs submit that the DUM attached to PGW's Answer "is not the incomplete version that runs afoul of the OWBPA that was supplied to Plaintiffs at their termination sessions." Pl.'s Br. in Opp., ECF No. 300 at 5 n.9. As Plaintiffs contend, the DUMs provided to them were missing every other page, and therefore, the waivers in the Separation Agreements are invalid and unenforceable as to their claims. *See* First Am. Compl., ECF No. 54 at 28.

7. PGW makes reference to an additional four managers, for a total of ten decision-makers regarding the RIF selections: David King, Director of Enterprise Excellence and Quality in Evansville, IN; Tom Casey, Manager of Advanced Production at a Satellite manufacturing facility located near PGW's Crestline, OH plant; Craig Barnette, Plant Manager at the Creighton, PA facility; and Pete Dishart, Director of New Production Development in PGW's OEM Glass New Product Research and Development group in Harmarville, PA. Those individuals made the RIF-related decisions for, respectively, Csukas, Marcelonis, DeAngelis, and Voeltzel, who are no longer participants in this action.

290-7 at 36. Before the RIF, Manufacturing Technology was comprised of twenty-seven salaried associates. *Compare id.* (depicting the organizational structure of Manufacturing Technology before the RIF) *with id.* at 38 (depicting same after the RIF).

Six employees were selected by Cannon for termination in the RIF, which included Karlo, McLure, Cunningham, Marietti and Meixelsberger who were all part of his group. Cannon had worked with each of these individuals for many years at PPG and had full knowledge of their job-related skills, performance, and capabilities. *See* Decl. of Cannon, ECF No. 290-38 at 3; Dep. of Cooney, ECF No. 290-39 ("Gary Cannon, you know, had intimate knowledge with all of the technology people in his organization, and he alone was qualified to determine what, you know, what the technical -- because the work was going to still be there."). According to Cannon, he did not receive any specific direction from upper management regarding how he was to arrive at his decisions or any assistance from other PGW employees with the exception of Jarden who only put together the severance packages for the terminated individuals.

Rather, Cannon contends that he objectively evaluated the group as a whole and independently decided to release certain employees based on the needs of his department. Cannon did not use a forced ranking for his department which was previously compiled with the support of his direct reports: Jim Willey; F.M. Hagan; Jim Schwartz, who supervised Cunningham; David Perry, who supervised Marietti; Phillip Sturman, who supervised Karlo and Meixelsberger; and Julie Bernas, who supervised McLure. Based on those rankings, Cannon testified that two other employees ranked lower than some of the plaintiffs, but that they were retained based on their specialized skills and knowledge which he deemed vital to his group.

Cannon further insists that he never considered the age of an employee in arriving at his decision. As compared to the Representative Plaintiffs, Cannon is older than Karlo, Cunningham and Meixelsberger and one to two years younger than Marietti and McLure—all of whom were in their fifties at the time.

### i. Karlo

Karlo began working for PPG in its automotive glass division in 1978 as a Construction and Maintenance Research Specialist II. Throughout his thirty-year career, he received several promotions: to Senior Technical Assistant in 1990, to Engineering Specialist in 1995, and finally to Senior Engineering Specialist in 2001, a position he held until his termination. His job duties included working in and later supervising the "mold shop" in which tools for bending glass are built. Karlo also helped to develop eight shared patents and received commendations, pay increases, and bonuses, as well as positive reviews in his annual employee evaluation process, referred to as the Performance & Learning Plan ("P&LP") at PPG. Compliance with the P&LP process waned at PPG in the three years before the RIF, particularly as the sale of its glass assets drew near. *See* Dep. of Cannon, ECF No. 301-12 at 3. PGW did not reinstitute the P&LP evaluation process, but earlier documents dating back to 1992 demonstrate that Karlo "meets" or "meets +" expectations or "Exceeds Requirements."

Cannon testified that Karlo was terminated because most of his work was already being outsourced to other firms and that two other PGW employees could pick up his ongoing tasks. Those employees, Irv Wilson and John Bender, are both older than Karlo.

Karlo recalls that he questioned Cannon after the termination session as to why he was included in the RIF. Cannon allegedly responded that the retained employees were more "adaptable" and remarked that "we don't see you moving forward with the company as it moves

forward." *See* Dep. of Karlo, ECF No. 290-43 at 3-4. Cannon claims that he does not remember the specifics of this conversation. *See* Dep. of Cannon, ECF No. 290-34 at 11-13. Nevertheless, from Karlo's perspective, these remarks demonstrate that Cannon and the other PGW managers charged with making the termination decisions "held age biases" and "acted with discriminatory intent in selecting Plaintiffs for termination."[8]

Six months after the RIF, PGW rehired Karlo as a contract employee through a placement agency and assigned him to the Creighton facility. Karlo was terminated from that position in July 2010, allegedly at the behest of Vice President of HR Robert McCullogh in retaliation for filing an EEOC charge relating to the RIF.

## ii. McLure

McLure started his career with PPG as a contractor at the Glass Research & Technology Laboratory ("GRTL") in 1975 and became a full-time employee the following year. In 1980, McLure was terminated when PPG closed that facility. PPG rehired McLure in 1981 to work at its Fiberglass Research facility in O'Hara Township at which he was promoted to Senior Technician in 1990. PPG closed that facility in 1999 and slated McLure for a transfer to North Carolina. McLure instead pursued another opportunity within PPG at its Harmarville facility where he eventually rose to become Senior Technical Assistant. As an employee in this division, McLure was responsible for conducting validation testing, traveling to satellite facilities, and providing customer support and technical services at the facilities. Throughout his thirty-four-

---

8. Plaintiffs attempt to construe this comment regarding "adaptability" as part of a broader directive. *See* Pls.' Br. in Opp. at 6 ("Aside from the directive that employees be terminated who were not deemed to be sufficiently 'adaptable,' the senior managers had total discretion in making termination decisions, and did not rely upon past performance of the employees, or other objective standards for rating and ranking them."); *see also id.* at 1-2. A review of the testimony appended to the filings reveals that "adaptability" was not part of upper managements' directive. *See* Dep. of Cooney, ECF No. 301-1 at 17 ("Q. So were you looking for people that you thought would be adaptable, that would have the potential to carry out the obligations for those new positions that were being created? A. It was actually people that – that could step in the first day and be able to take it – the broader responsibilities."). The question of whether those statements allegedly made by Cannon give rise to an inference of age discrimination is left for another day.

year career, McLure received positive P&LP evaluations, regular salary increases, bonuses and commendations and worked as a named contributor on a patent developed for PPG.

Much as with Karlo, Cannon testified that McLure was terminated because validation work was being outsourced to another facility and Wilson / Bender could take over McLure's ongoing tasks. Wilson is older than McLure; Bender is only months younger.

In April 2009, McLure returned to PPG through a third-party placement agency. Three months later, in July 2009, McLure was approached by a PGW employee to return to the company. McLure agreed and split his time between PPG and PGW as a contract employee until he was released from PGW in September 2010, allegedly at the direction of McCullogh in retaliation for pursuing an EEOC charge.

### iii. Cunningham

Cunningham joined PPG's Glass Research & Development Center in Harmarville as a contract employee and became a full-time employee in 1996. The majority of his time was initially devoted to the Laminated Glass Project on which he worked from its validation study through testing until the final product, known as Sungate Coated Laminate, was ready for manufacture at PPG's facilities in Crestline and Tipton. Based on his contributions to this project, Cunningham was promoted in 2004 to Senior Technical Assistant in the OEM New Product & Process Development Group. His job duties in this capacity were to preform measurements of glass, process and variables; analyze the data; and compile reports. Throughout his career, Cunningham received positive P&LP evaluations, annual salary increases, and merit bonuses.

Cannon testified that Cunningham was terminated because his work as a technician and his ongoing tasks could be absorbed by other employees, Schwartz, Mike Fecik, and Tom Cleary. Fecik and Clearly are both older than Cunningham; Schwartz is a year younger.

### iv.    Marietti

Marietti began his career at PPG as a contract employee in the construction and maintenance shop at its Harmarville automotive glass facility in 1984 and transferred to the Mold Shop in 1990. In 1994, Marietti became a direct PPG employee and obtained the title of Construction & Maintenance ("C&M") Research Specialist II. Marietti was promoted in 1996 to C&M Research Specialist I and again in 2002 to Senior C&M Specialist Tooling & Instrumentation in the OEM Technology Transfer Group. Although his job title remained the same, Marietti was given greater responsibility sometime in 2003 when he began to perform the job functions of a Technical Assistant, a role in which he continued until the RIF. His job duties were to perform measurements of glass, process and variables; analyze the data; and compile reports. Throughout his career, Marietti received positive P&LP evaluations.

Cannon testified that Marietti was terminated because tooling was being outsourced and the other work assigned to him could be absorbed by Fecik, Schwartz, and Cleary. Cleary and Fecik are both older than Marietti; Schwartz is four years younger.

### v.    Meixelsberger

Meixelsberger started at PPG in 1987 and became known as an industry-leader in the windshield bending process over the next twenty-two years. Throughout his career, Meixelsberger received positive P&LP reviews and commendations, including when Cannon hand-selected him to service in a specialized manufacturing group comprised of five employees. His last position was as Senior Technical Assistant Windshield Bending in which his duties

included working on windshield on the bending lehr, developing sample parts for customers, and troubleshooting in the field where his services were in high demand.

Cannon testified that Meixelsberger was terminated because his work could be absorbed by Wilson and Bender. Wilson and Bender are both older than Meixelsberger.

### b. Skeen (Breen)

Breen joined PPG in 1972 and later became Production Supervisor at Crestline Plant. His job duties were to supervise the hot and cold ends of a production line. At the time of the RIF, his Shift Supervisor was Rodney Auck.

Skeen began his career with PPG in 1996 as a research engineer and assumed the position of plant manager at Crestline in 2008. At the start of 2009, Skeen began to interact with Breen on a daily basis and held meetings with him weekly.

Skeen made the decision to terminate Breen for "performance reasons," testifying that he did not consider age in the process. Instead, Skeen received input from the lower level managers at the plant through a forced ranking in 2008 facilitated by Jim Phillips, Crestline's HR Manager. *See* Crestline Forced Ranking, ECF No. 294-67 at 4. The forced ranking required the managers to individually rank the non-managerial salaried employees at the Crestline facility. Breen placed near the very bottom of the list. A compilation of these forced rankings recirculated among the managers in early-March 2009 as a starting point for RIF-related discussions.

In conjunction with Breen's termination, Philips compiled a DUM that listed the ages of the other production supervisors at the time of the RIF. According to Breen, he was replaced by Mike Cowan, Rick Woogerd and Denny Boyce, all of whom are one to three years his junior.

### c. Holmes (Clawson)

Clawson started with PPG in 1979 at its Crestline plant as a process engineer and moved to its Evansville facility around 1984. As a Project Engineer in the maintenance department, his primary job duties were installing new equipment and/or revising and improving existing equipment. His direct supervisor was Michael Scolar.

PGW hired Holmes in January 2009 to serve as the Plant Manager at its Evansville facility. Holmes made the decision to terminate Clawson in consultation with local managers and the HR Director for Evansville, Sarah Leider, as part of a larger reorganization plan to flatten its structure and integrate the maintenance department into the value stream lines. Holmes testified that Clawson was selected based on projections that future operation would require electrical engineering experience which Clawson lacked as a mechanical engineer and that the plant had an oversupply of glass due to a strike bank.[9]

In conjunction with Clawson's termination, Leider compiled a DUM that listed the job titles and ages of the other engineers at the time of the RIF. Rick Mullin and Kurt Steinbacher, two other plant employees who are both older than Clawson, assumed many of his duties.

### d. Eilers & Wysseier (Shaw)

Shaw was hired by PPG in 1983, and he worked as a Marketing Manager for LYNX from PGW's headquarters in Pittsburgh. His duties included managing participant programs, supervising management teams responsible for retailer database administration and glass program enrollment, and serving as LYNX's industry representative for windshield repair. Shaw's direct supervisor was Paul McFarland.

---

9. In late 2008, the Evansville plant built a three-month strike bank to protect against any work stoppage related to a union certification process. Once demand shrunk, it held enough inventory to stock the facility for eight to nine months without operating.

From October 2008 through March 2009, Eilers was the General Manager of ARS & Services with a supervisory role over the entire LYNX business in which Shaw worked. Wysseir, the then-Director of Service Solutions of LYNX, reported to Eilers and was responsible for the day-to-day business operations. Eilers and Wyssier were responsible for Shaw's termination. Eilers is older than Shaw; Wyssier is six years younger.

Eilers and Wyssier did not receive any specific direction from upper management to arrive at their decision, but instead jointly selected Shaw for the RIF as part of their efforts to flatten the organization and reallocate duties into preexisting roles. Sandy Frazier, the HR manager for the department, assisted Eilers and Wyssier in assembling a document outlining job duties department-wide. Based on their assessment, Eilers and Wyssier decided to reallocate and distribute Shaw's duties to McFarland and Susan Avis. According to Shaw, another employee six years his junior, Alba Rosati, also assumed some of his job responsibilities after the RIF.

### e. Fencak (Titus)

Titus became a PPG employee in 2000 when his prior employer merged into PPG Auto Glass, LLC. Titus was the Area Services Manager at the AG warehouse in Irving, and his direct supervisor was Mark Summersett.

Fencak was the Territory Director in 2009, and he worked in PGW's Area Services – Texas division. Around December 2008, Fencak received training from PGW human resources employees Jaden and Karen Lindsey on issues relating to restructuring and forced rankings. Fencak received additional training around January 2009 by Talbert and David Goldstein who explained that the termination decision should be based on position, location and performance.

Fencak testified that he followed his training on how to select employees for termination and decided to consolidate Titus' position with the call center manager position held at the same

location by Donna Bernard.  To reach his decisoin, Fencak consulted with Summersett and Mary Ramsaur, Bernard's direct supervisor.  Bernard was selected to remain based on her skill set and warehouse experience, while Titus would have required six to nine months of specialized training to learn how to manage the call center.  Bernard is ten years younger than Titus.

### 5. Alleged RIF Practices Related to Plaintiffs' Adverse Impact Theory

Plaintiffs allege that several of PGW's RIF practices in March 20009 adversely impacted its older workers.  *See* First Am. Compl., ECF No. 54 at 3, ¶¶ 12(a)-(h); *see also* Proposed Second Am. Compl., ECF No. 299-1 at 4-6, 15-23.  Among those acts and omissions with which Plaintiffs take issue are the absence of an adverse impact analysis by Jaden, Cooney, or Dunn; the nonuse of RIF guidelines by PGW that were in place at PPG; the absence of objective standards for the managers to use in deciding who to terminate; the lack of credit given to an employee's tenure, seniority or their historical performance ratings; the "grossly understaffed" HR department; the lack of formal EEO training or HR oversight beyond administrative support; the dearth of written records that explain the individual termination decisions; and the failure of PGW to revive PPG's yearly evaluation process.  *See id.*; *see also* Pls.' Br. in Opp., ECF No. 300 at 5-9; Ex. QQQ, ECF No. 303-16 (RIF Guidelines, Oct. 30, 2000).  Plaintiffs further submit that PGW never apprised its terminated employees of the factors relied upon in selecting them for the RIF, revealed the method by which they were chosen, nor offered a truthful explanation for the decision.  According to Plaintiffs, these (in)actions depart from reasonable industry standards, flout sound HR practice, and violate federal employment laws.

### B. Procedural History

Representative Plaintiffs each filed charges of employment discrimination based on age against PGW with the Equal Opportunity Employment Commission ("EEOC") in late January

2010.  *See* Compl., Ex. A., ECF No. 1-3.  Thereafter, they each received a Dismissal and Notice of Rights from the EEOC.  *See id.* at Ex. B., ECF No. 1-4.  This lawsuit followed.

Representative Plaintiffs initiated this action on behalf of themselves and all others similarly situated against PGW on September 29, 2010 by filing a three-count "Collective Action Complaint" in which they allege (1) disparate treatment as to the putative collective in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*, ("ADEA"); (2) disparate impact as to the putative collective in violation of the ADEA; and (3) retaliation as to only Karlo and McLure in violation of the ADEA.  Notably, the ADEA incorporates by reference the representative enforcement provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, and thus expressly permits collective actions.  *See* 29 U.S.C. §§ 216(b), 626(b).

PGW filed its responsive pleading on November 29, 2010 in which it asserts counterclaims for breach of contract and unjust enrichment against each Representative Plaintiff. (ECF No. 8 at 78-83).  PGW avers that at the time of their terminations, each Representative Plaintiff was offered a "Separation Agreement and Release" which provided that they would receive severance benefits and payments to which they otherwise were not entitled in exchange for releases of any claims against PGW.  Further, PGW avers that each Representative Plaintiff executed those Releases and never revoked their acceptance of the terms, but that each now asserts claims in this action which they otherwise waived.[10]

PGW also filed a Motion to Dismiss Count Three of the Complaint – *i.e.*, the retaliation claim brought as to only Karlo and McLure – on November 29, 2010.  (ECF No. 9).  Plaintiffs

---

10.  According the PGW, it paid the following severance amounts: $52,549.00 to Karlo; $44,591.00 to McLure; $19,218.00 to Cunningham; $25,505.00 to Marietti; and $37,940.00 to Meixelsberger.

opposed this motion.[11]  (ECF No. 32).  Judge Fischer held a hearing on the motion on February 7, 2011.  The minute entry for that hearing indicates that "the parties and court agreed that in the interest of justice, Plaintiffs should proceed with the filing of an amended complaint."  (ECF No. 46).  Accordingly, the court denied the motion without prejudice.

Plaintiffs filed a Motion to Dismiss PGW's Counterclaim on December 22, 2010 in which they argued that the Releases are invalid and unenforceable.  (ECF No. 24).  The same day, Plaintiffs filed a Motion to Strike Certain of PGW's Affirmative Defenses based on their position that the defenses fail as a matter of law, that they are in contravention of controlling law and/or that they fail to conform to the federal pleading standards.  (ECF No. 26).  PGW opposed both motions.  (ECF Nos. 33, 34).

Judge Fischer held a hearing/argument on February 7, 2011 regarding PGW's Motion to Dismiss Count Three of the Complaint.  The minute entry from that hearing states that "the parties and court agreed that in the interest of justice, Plaintiffs should proceed with the filing of an amended complaint" and that "[t]he Court held in abeyance argument related to Plaintiffs' motion to dismiss and motion to strike as they are not completely briefed."  (ECF No. 46).  Judge Fischer entered an appropriate Order the following day.  (ECF No. 48).

Plaintiffs filed a First Amended Complaint on February 15, 2011.  (ECF No. 54).  PGW renewed its Motion to Dismiss Count Three on March 1, 2011.  (ECF No. 59).  Plaintiffs again opposed the motion.  (ECF No. 63).

Judge Fischer held a hearing/argument on March 23, 2011 regarding the Motion to Dismiss Defendant's Counterclaim, Motion to Strike Certain of PGW's Affirmative Defenses,

---

11.  The Court notes that reply briefs and surreply briefs were commonplace in the motion practice throughout this action, but that it will not specifically reference them unless relevant to those matters now pending.  *See, e.g.*, Mem. Order, ECF No. 69 at 1 ("The parties have briefed each motion extensively . . . . *See* Dockets Nos. 24, 25, 26, 27, 33, 34, 50, 53, 57, 59, 60, 63, 64, 65.").

and Motion to Dismiss Count Three of the Complaint. The minute entry for that hearing notes that "[t]he Court denied said motions on the record." (ECF No. 68). A Memorandum Order memorializing that ruling was entered the following day. (ECF No. 69).

PGW filed its Answer to the First Amended Complaint and its Amended Affirmative Defenses and Counterclaim on April 14, 2011. (ECF No. 73). Count One of the Amended Counterclaim set forth a claim for breach of contract against all Representative Plaintiffs except for Thompson; Count Two of the Amended Counterclaim pled an unjust enrichment/restitution claim against all Representative Plaintiffs. Plaintiffs filed their Answer and Affirmative Defenses to the Amended Counterclaim on May 4, 2011. (ECF No. 77).

On April 18, 2011, Judge Fischer entered a Case Management Order (ECF No. 75) in which she initially granted Plaintiffs approximately three months to engage in some preliminary discovery and file their motion for conditional certification. Judge Fischer routinely held status conferences regarding discovery with the parties and ultimately extended the deadline for Plaintiffs to file their motion for conditional certification to early October 2011.

On October 3, 2011, Plaintiffs filed a Motion for Leave to File a Second Amended Complaint (ECF No. 87). PGW opposed the motions. (ECF Nos. 92). By Memorandum Opinion dated October 31, 2011, Judge Fischer found that the Plaintiffs did not show good cause as required by Rule 16 and denied the motion for leave without prejudice. (ECF Nos. 98, 99).

Plaintiffs also filed a Motion for Conditional Certification and Court-Facilitated Notice on October 3, 2011. (ECF No. 88). PGW filed its response in opposition on November 14, 2011. (ECF No. 106). Four days earlier, on November 10, 2011, PGW filed a Motion for

Summary Judgment on [the] Collective Action Allegations and Disparate Impact Claim.[12]  (ECF No. 101).  Plaintiffs likewise opposed that motion.  (ECF No. 123).  Judge Fischer held a hearing/argument on the Motion for Conditional Certification on December 19, 2011, took the matter under advisement, and ordered supplemental briefing.  (ECF Nos. 131, 132).

On January 13, 2012, the parties filed a Joint Motion to Stay Rulings on Motions Pending Completion of Mediation scheduled for February 2, 2012 before the Hon. Donald E. Ziegler (ret.).  (ECF No. 141)  The motion was granted on January 17, 2012.  (ECF No. 145).  A mediation session was held on February 2, 2012, but the case was not resolved.  (ECF No. 149).  A status conference was held on February 24, 2012 during which the parties discussed additional mediation options, including the possibility of a conference with the court.  (ECF No. 156).

The parties also supplemented the summary judgment record with additional citations to authority per Court Order after their mediation did not resolve this matter.  (ECF Nos. 153, 154, 158).  Based upon those filings, Judge Fischer held a second hearing/argument on the Motion for Conditional Certification on March 12, 2012.  (ECF No. 161).  Afterward, the parties agreed that their positions relative to that motion and the motion for summary judgment were substantially similar such that another hearing/argument would be unnecessary.  (ECF Nos. 162).

By Memorandum Opinion and Order of Court dated May 9, 2012, Judge Fischer granted in part the motion for conditional certification and denied the motion for summary judgment.  (ECF Nos. 179, 180).  The Order of Court specified (1) that Plaintiffs shall pursue discovery as to the proposed class of employees who were, on or about March 30 and 31, 2009, (a) 50 years of age or older; (b) who were employed by PGW; (c) who were members of the salaried workforce; and (d) who were terminated from employment with PGW by the RIF implemented

---

12.  Contrary to PGW's motion, the disparate impact claim is pled at Count Two rather than Count One of the First Amended Collective Action Complaint.  *Compare* First Am. Compl, ECF No. 54 at 38 *with* Mot. for Summ. J., ECF No. 101 at 1.

on March 30 and 31, 2009; (2) that the Motion for Conditional Certification was denied to the extent that Plaintiffs sought approval of their proposed notice; and (3) that the Motion for Summary Judgment was denied without prejudice. (ECF No. 180).

The parties met and conferred regarding the nature and form of a proposed notice. On May 14, 2012, Judge Fischer accepted their agreed-upon form after some modification and ordered Plaintiffs to send it to the putative members of the collective by June 1, 2012 with an opt-in deadline of July 16, 2012. (ECF No. 184). Notice was thereafter sent to fifty-nine former PGW employees.

PGW filed a Motion to Certify for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b) on May 23, 2012 in which it sought to appeal whether sub-grouping is permitted in disparate impact claims under the ADEA; whether court should apply *Wal-Mart Stores Inc. v. Dukes* at each stage of the collective action certification process; and whether the "modest factual showing" standard includes a modest showing that the proposed class members can present a claim for disparate impact. (ECF No. 186) Plaintiffs opposed the motion. (ECF No. 195). Judge Fischer denied the motion without prejudice on July 20, 2012 in which she noted that the court only *conditionally* certified a collective action and reminded PGW that it could address its concerns at the final certification stage. (ECF No. 205).

The consents to opt-in were filed of record in late July and early August 2012. (ECF Nos. 206-221. 223, 224). Those persons included the seven Representative Plaintiffs and the eleven (of the fifty-nine potential over-50 claimants) Opt-in Plaintiffs.[13] The parties thereafter engaged in significant discovery.

---

13.   Representative Plaintiffs Thompson, Karlo, Csukas, Marietti and McLure and putative opt-in Marilyn Workinger all untimely submitted their opt-in form. Judge Fischer permitted the Representative Plaintiffs to move forward as part of the conditionally-certified collective action but disallowed Workinger the same opportunity. (ECF No. 232).

At a status conference hearing held on October 26, 2012, the parties discussed the possibility of a settlement conference. (ECF No. 239). PGW objected to Judge Fischer presiding over any such matter, and the parties discussed the possibility that another district judge or magistrate judge would preside. *Id.* On November 20, 2012, Plaintiffs filed a Motion for Settlement Conference in which they requested that Judge Arthur J. Schwab of this District Court preside if he was so available. (ECF No. 243). PGW objected to the motion as premature and submitted that it would be more appropriate for the parties to engage a third-party mediator rather than any district court judge should Plaintiffs' request be granted. (ECF No. 245). Judge Fischer denied the motion on November 29, 2012, but directed the parties at a March 5, 2013 status conference to meet and confer to discuss a possible settlement conference. (ECF Nos. 246, 249). During the pendency of that matter, Plaintiffs filed a stipulation of dismissal on behalf of three of the opt-ins: Conaway, Diaz and Fellabaum. (ECF Nos. 247, 248).

Plaintiffs filed a Motion for Leave to File a Second Amended Complaint on March 18, 2013 in which they sought to add facts developed in discovery, narrow the focus of their claims, and make miscellaneous stylistic and organizational revisions. (ECF No. 251). PGW opposed the motion. (ECF No. 252). On April 30, 2013, Plaintiffs renewed their Motion for Settlement Conference. (ECF No. 262). PGW yet again opposed the motion. (ECF No. 263). Judge Fischer granted the motion on May 7, 2013 in which she noted the following:

> This case was filed nearly 3 years ago in September 2010. In the three years since that filing, there have been several amended complaints, motions practice, numerous court conferences, conditional class certification, and protracted discovery. Now that fact discovery has finally closed, and before an onslaught of projected dispositive motions, the Court finds the matter ripe for settlement negotiations . . . .

(ECF No. 264). Judge Fischer also found that the interests of the parties were well-served if Judge Schwab presided over the conference(s). The motion for leave was denied without prejudice for resubmission after the settlement conferences. (ECF No. 268).

Judge Schwab held a Settlement Conference on May 8, 2013 during which parties reached a settlement as to Representative Plaintiff Thompson and Opt-in Plaintiff Wickwire. (ECF Nos. 266, 269, 325, 326). After that proceeding, Judge Schwab scheduled another conference for June 13, 2013 to further discuss the potentiality of settlement with the thirteen remaining Plaintiffs. (ECF No. 267). That conference proceeded as scheduled and continued into the following day. (ECF Nos. 279, 286). The case was not resolved. (ECF No. 281).

Judge Fischer entered a Scheduling Order on June 14, 2013 with regard to PGW's anticipated motion for decertification and vacated all deadlines for Motions for Summary Judgment and *Daubert* challenges until the resolution of said motion. (ECF No. 280). On June 26, 2013, this action was transferred to the undersigned.

PGW proceeded as expected and filed its motion for decertification on June 28, 2013. (ECF No. 288). Plaintiffs renewed their Motion for leave to File a Second Amended Complaint on July 15, 2013 in which they note that Representative Plaintiffs Csukas and Thompson and Opt-in Plaintiffs Wickwire, Marcelonis, Voeltzel, and DeAngelis have settled. (ECF No. 299).[14]

Additional motions soon followed. Plaintiffs filed a Motion for Leave to File Amicus Brief of Professor Sandra Sperino on July 3, 2013, which the Court later denied. (ECF Nos. 295, 296, 320). PGW filed four expert challenges on August 2, 2013, and Plaintiffs filed a Motion to

---

14. The Court is only in receipt of Stipulations of Dismissal for Conaway, Diaz and Fellabaum (ECF Nos. 247, 248); Thompson (ECF Nos. 325, 329), and Wickwire (ECF Nos. 326); however, the parties have not yet filed stipulations for Csukas, DeAngelis, Marcelonis, and Voeltzel despite counsels' repeated representations that those parties have settled their claim(s) in this action. *See* Pls.' Renewed Mot. for Leave to File Sec. Am. Compl., ECF No. 299 at 2; Pls.' Br. in Opp., ECF No. 300 at 2, n.2. Based on those representations, the Court will treat Csukas, DeAngelis, Marcelonis, and Voeltzel as having been dismissed.

Strike the expert challenges on August 5, 2013. (ECF Nos. 316, 317, 318, 319). The parties have fully briefed the issues with regard to the motion to strike, but the Court has not yet ordered Plaintiffs to file a substantive response to the expert challenges given the procedural posture of this action and the pendency of these various motions. (ECF No. 333, 336).

The Court heard oral argument on September 10, 2013, and a transcript of that proceeding has been filed of record. (ECF No. 342). The parties thereafter filed additional briefs, all of which the Court has taken into consideration. (ECF No. 337, 338, 339, 341).

## II.     Legal Standard

There are two applicable legal standards at this stage: the decertification/final certification mechanism(s) under the FLSA, as incorporated by the ADEA; and Rule 15 of the Federal Rule of Civil Procedure which governs amendments to pleadings.

### A.  "Decertification"

The "collective action" mechanism set forth in 29 U.S.C. § 216(b) provides that one or more employees alleging an FLSA violation may bring suit "for and in behalf of . . . themselves and other employees similarly situated." *See Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 192 (3d Cir. 2011)*, rev'd on other grounds*, 133 S. Ct. 1523 (2013). To decide whether a suit brought under § 216(b) may move forward as a collective action, courts within the Third Circuit follow a two-step approach. *See Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 536 (3d Cir. 2012) ("In *Symczyk*, we noted that this two-tier approach, while 'nowhere mandated . . . appears to have garnered wide acceptance.' We implicitly embraced this two-step approach, and we affirm its use here.") (quoting *Symczyk*, 656 F.3d at 193 n.5).[15]

_____

15. Citing to this Court's opinion in *Moore v. PNC Bank, N.A.*, 2:12-CV-1135, 2013 WL 2338251 (W.D. Pa. May 29, 2013), PGW suggests that "*Zavala* has been interpreted by district courts in the Third Circuit as creating a new heightened standard." PGW's Br. in Support, ECF No. 289 at 11. PGW is mistaken. First, *Moore* dealt solely with conditional certification. *Moore*, 2013 WL 2338251, at *2. Second, the citations to *Zavala* in *Moore* are little more

At the first stage, "the court makes a preliminary determination whether the employees enumerated in the complaint can be provisionally categorized as similarly situated to the named plaintiff." *Symczyk*, 656 F.3d at 192. The level of proof required at this stage is fairly lenient: a "'modest factual showing' that the proposed recipients of opt-in notices are similarly situated." *Id.* at 192-93 (citation omitted). Under this standard, "a plaintiff must produce some evidence, beyond pure speculation, of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." *Id.* at 193 (citation and quotation marks omitted).

"If the plaintiffs have satisfied their burden, the court will 'conditionally certify' the collective action for the purpose of facilitating notice to potential opt-in plaintiffs and conducting pre-trial discovery." *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013) (citing *Zavala*, 591 F.3d at 536). *See Symczyk*, 656 F.3d at 194 (observing that "[a]bsent from the text of the FLSA is the concept of 'class certification'" despite the "judicial gloss" on § 216(b) in which many courts "have used the vernacular of the Rule 23 class action for simplification and ease of understanding when discussing representative cases brought pursuant [to the FLSA]"); *see also Zavala*, 691 F.3d at 534 (noting that the "decertification" terminology was "misleading"). A putative member must then affirmatively opt-in by filing express, written consents with the court to become party-plaintiffs, a feature that distinguishes collective actions from the opt-out mechanism unique to class actions brought under Rule 23. *Id.* at 242-43. "After discovery and with the benefit of a much thicker record than it had at the notice stage," a district court following this approach will ultimately turn to the step two of this process.

---

than fleeting references in the standard of review. *See id.* at **2-3. Third, the *Zavala* Court does not purport to raise the bar to final certification but instead held that plaintiffs must satisfy their burden at the second stage by a preponderance of the evidence and that courts must follow the ad-hoc approach rather than those derived from Rule 23. 691 F.3d at 536-37.

*Symczyk*, 656 F.3d at 193 (citation and quotation marks omitted). "This step may be triggered by the plaintiffs' motion for 'final certification,' by the defendants' motion for 'decertification,' or commonly, by both." *Camesi*, 729 F.3d at 243 (citing *Symczyk*, 656 F.3d at 193).

At the second stage, the court "'makes a conclusive determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiff.'" *Id.* (quoting *Symczyk*, 656 F.3d at 193). *See also Zavala*, 691 F.3d at 536 ("It is clear from the statutory text of the FLSA that the standard to be applied on final certification is whether the proposed collective plaintiffs are 'similarly situated.'") (internal citations omitted). The law in this circuit requires that, in making this determination, the court follow the ad-hoc approach in which the court "considers all the relevant factors and makes a factual determination on a case-by-case basis." *Zavala*, 691 F.3d at 536.

The burden rests with the plaintiffs to establish by a preponderance of the evidence that they satisfy the similarly situated requirement. *Id.* at 537 (citations omitted). *See also Symczyk*, 656 F.3d at 193 ("[T]he second stage is less lenient, and the plaintiff bears a heavier burden."). Stated differently, the lead plaintiffs must at least get over the line of "more likely than not" in showing that the opt-in plaintiffs are in fact "similarly situated" to those named plaintiffs. *See Zavala*, 691 F.3d at 537 (citing *Myer v. Hertz Corp.*, 624 F.3d 537 at 555 (2d Cir. 2010); *O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 584 (6th Cir. 2009)). Should the plaintiffs meet that level of proof, the case may proceed to trial on the merits as a collective action. *Symczyk*, 656 F.3d at 193. If the collective members do not satisfy their burden, "the court will decertify the group, dismiss the opt-in plaintiffs without prejudice, and permit any remaining plaintiffs to move on to the trial stage of litigation." *Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372, 378 (W.D. Pa. 2011) (citing *Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291, 299-300 (E.D. Pa.

2010)).  *See also* 7B THE LATE CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1807 (3d ed. 2010).

## B.  Amendments to Pleadings

Federal Rule of Civil Procedure 15 provides, in relevant part, that "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  This liberal approach to pleading is not unbounded, and the decision whether to grant or to deny a motion for leave ultimately rests within the sound discretion of the trial court.  *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990).  Certain basic principles guide the exercise of this discretion.  *See Lincoln Gen. Ins. Co.*, 1:11-CV-1195, 2013 WL 214634, at **4-5.  A district court may deny leave to amend a complaint where "it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party."  *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000) (citation omitted).

Among the equitable Rule 15 considerations, the United States Court of Appeals for the Third Circuit has "consistently recognized [ ] that 'prejudice to the non-moving party is the touchstone for the denial of an amendment.'"  *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006) (quoting *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993)).  In determining what constitutes prejudice to the non-moving party, the Court must consider whether the assertion of an additional claim would "'(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the [party] from bringing a timely action in another jurisdiction.'"  *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).  *See Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001)

("The issue of prejudice requires that we focus on the hardship to the defendants if the amendment were permitted.") (citation omitted); *Dole*, 921 F.2d at 488 ("In order to make the required showing of prejudice, regardless of the stage of the proceedings, [Defendant] is required to demonstrate that its ability to present its case would be seriously impaired were amendment allowed."). Merely claiming prejudice is insufficient. *Dole*, 921 F.2d at 487. "In the absence of substantial or undue prejudice, denial instead must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment." *Lorenz*, 1 F.3d at 1414 (citation omitted).

## III. Discussion

The Court will discuss PGW's Motion for Decertification and Plaintiffs' Renewed Motion for Leave to File Second Amended Complaint seriatim.

### A. Decertification

The parties' legal arguments are wide-ranging and heavily briefed, but the legal issues can be distilled into three discrete categories: the "sub-grouping" of an over-fifty-years-old disparate impact collective action under the ADEA; the ad-hoc approach to the "similarly situated" analysis; and the affect (if any) of the disparate treatment count in the First Amended Complaint. After careful consideration of the motion, the filings in support of and in opposition thereto, the relevant case law cited by the parties, and the Memorandum Opinion conditionally certifying this action, the Court concludes that decertification is appropriate at this stage.

#### 1. "Subgrouping" Under the ADEA

As a threshold matter, the parties dispute whether an over-fifty-years-old subgroup is cognizable under the ADEA. The Court of Appeals for the Third Circuit has yet to address this novel question, but every court of appeals to face the issue has declined to recognize this theory

with regard to disparate impact claims. *See E.E.O.C. v. McDonnell Douglas Corp.*, 191 F.3d 948 (8th Cir. 1999); *Smith v. Tennessee Valley Auth.*, 924 F.2d 1059 (6th Cir. 1991); *Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364 (2d Cir. 1989), *superseded on other grounds by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074, *as recognized in Smith v. Xerox Corp.*, 196 F.3d 358, 368 (2d Cir. 1999).

For example, in *McDonnell Douglas*, the Court of Appeals for the Eight Circuit declined to "expand [its] recognition of disparate-impact claims under the ADEA to include claims on behalf of subgroups of the protected class." 191 F.3d at 950. There, the proposed subgroup was employees aged fifty-five and older who were terminated in a RIF. *Id.* As the court explained, "if such claims were cognizable under the statute, a plaintiff could bring a disparate-impact claim despite the fact that the statistical evidence indicated that an employer's RIF criteria had a very favorable impact upon the entire protected group of employees aged 40 and older, compared to those employees outside the protected group. Congress could have intended such a result." *Id.* at 951. The court of appeals further recognized "that if disparate-impact claims on behalf of subgroups were cognizable under the ADEA, the consequence would be to require an employer engaging in a RIF to attempt what might well be impossible: to achieve statistical parity among the virtually infinite number of age subgroups in its work force." *Id.* Thus, as the court concluded, the "[a]doption of such a theory [ ] might well have the anomalous result of forcing employers to take age into account in making layoff decisions, which is the very sort of age-based decision-making that the statute proscribes." *Id.*

Several district courts have followed this approach. *Rudwall v. Blackrock, Inc.*, C09-5176TEH, 2011 WL 767965, at **10-11 (N.D. Cal. Feb. 28, 2011); *Schechner v. KPIX-TV*, C 08-05049 MHP, 2011 WL 109144, at *4 (N.D. Cal. Jan. 13, 2011) ("Every court of appeals

decision addressing this issue has concluded that it is improper to distinguish between subgroups of employees over the age of 40 and that a disparate impact analysis must compare employees aged 40 and over with those 39 and younger."); *Kinnally v. Rogers Corp.*, CV-06-2704-PHX-JAT, 2009 WL 597211, at **9-10 (D. Ariz. Mar. 9, 2009); *see also Fulghum v. Embarq Corp.*, 938 F. Supp. 2d 1090, 1131 n.156 (D. Kan. 2013). The Court is aware of only two district court decisions beyond the context of this action that have explicitly taken a contrary view. [16] *See Finch v. Hercules Inc.*, 865 F. Supp. 1104, 1129-30 (D. Del. 1994); *Graffam v. Scott Paper Co.*, 848 F. Supp. 1, 3-5 (D. Me. 1994).

But every court to decide this matter has done so within the context of a summary judgment ruling—*i.e.*, not at the decertification stage.[17] The parties have not cited and the Court has not found any case in which a motion for decertification was the proper procedural vehicle to challenge this theory. *C.f. McDonnell Douglas*, 191 F.3d at 951 ("More importantly, in this case the EEOC itself maintains that McDonnell Douglas relied on criteria such as retirement eligibility, salary, and seniority in making its layoff decisions . . . . We certainly do not think that Congress intended to impose liability on employers who rely on such criteria just because their use had a disparate impact on a subgroup."). The United States Court of Appeals for the Third Circuit has instructed district courts to follow the ad-hoc approach at this stage. This Court will, of course, follow that mandate.

---

16.  Plaintiffs also cite *Morrow v. City of Jacksonville, Ark.*, 941 F. Supp. 816, 823 (E.D. Ark. 1996) for the proposition that it "consider[ed] subgroup of officers over age fifty." Pls.' Br. in Opp., ECF No. 300 at 18 n.23. However, that court did not decide the subgrouping issue on the merits. *Morrow*, 941 F. Supp. at 824 ("The plaintiff urges the Court to only consider those over 50 when taking the test. Without commenting on whether using this more narrow age group is proper under the law, the Court will simply say that to do so makes no difference."). Later, Plaintiffs cite three disparate treatment cases, *Marshall v. Sun Oil Co. (Delaware)*, 605 F.2d 1331 (5th Cir. 1979); *Sheerin v. New York State Div. of Substance Abuse Servs.*, 844 F. Supp. 909 (N.D.N.Y. 1994); and *Moore v. Sears, Roebuck & Co.*, 464 F. Supp. 357 (N.D. Ga. 1979), and a Thomson Reuters/West Settlement Summary, *EEOC v. CENTRAL FREIGHT LINES INC.*, JVR No. 1208230029, 2012 Wl 3611427 (N.D. Tex. 2012), as authority supporting ADEA subgroups. Those citations have little persuasive value.

17.  A "motion to decertify collective action" was pending in *Fulghum*, but the resolution of the motion for summary on the ADEA disparate impact claim rendered it moot. 938 F. Supp. 2d at 1130-31, 1134.

## 2. "Similarly Situated"

The ADEA expressly incorporates the "powers, remedies and procedures" available in the FLSA, including its collective action mechanism for the enforcement of fair labor standards. 29 U.S.C. § 626(b) (citing 29 U.S.C. § 216(b)). Section 216(b) permits a collective action to go forward only if the Court determines that those who have opted in are in fact "similarly situated" to the representative plaintiffs. *See Camesi*, 729 F.3d 243 (quoting *Symczyk*, 656 F.3d at 193); *Myers*, 624 F.3d at 555; *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008). Neither the FLSA nor the ADEA define the term "similarly situated." *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 388 n.17 (3d Cir. 2007). *See also Moss v. Crawford & Co.*, 201 F.R.D. 398, 409 (W.D. Pa. 2000) ("Although the FLSA does not define the term 'similarly situated,' courts generally do not require prospective class members to be identical.") (citations omitted).

The United States Court of Appeals for the Third Circuit has identified relevant factors to consider as part of this analysis: "whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment." *Zavala*, 691 F.3d at 536-37 (citing *Ruehl*, 500 F.3d at 388 n.17). *See also Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001) (noting that different geographical location is not by itself conclusive but finding that plaintiffs were similarly situated when they all held the same job title throughout several locations). This list is not exhaustive, and our court of appeals has identified many other relevant factors: age variance, type of termination, the company division in which they worked, employment status, supervisors and salaries, factual and employment settings, individual defenses, fairness and procedural considerations, reliance on common evidence, and the presence of filings. *See id.* at 537 (citing

45C Am. Jur. 2d Job Discrimination § 2184).[18]  "Being similarly situated does not mean simply sharing a common status.  Rather, it means that one is subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA."  *Id.* at 538.

Plaintiffs allege that older workers were disparately impacted by a single, company-wide RIF that was implemented at the behest of top-level management of PGW, particularly President and CEO Wiggins, to reduce employee headcount.  Plaintiffs further allege that the nonuse of PPG's RIF guidelines constitutes a company-wide policy directed by PGW's top management and that Wiggins and his management team directed senior managers to make wholly subjective and entirely undocumented determinations as to which employees to terminate.

At face value, a number of factors unify the remaining party-plaintiffs and support the use of a collective action: that they all advance similar claims with the exception of the retaliation counts; that they all seek compensatory damages and injunctive relief; that they were all terminated as part of the March 2009 RIF; and that they all shared a common status of being over fifty-years-old at that time.  But these factors do not tip the scales upon further consideration.

The Court finds that Plaintiffs have not met their burden to show that they are similarly situated.  The remaining nine Plaintiffs held seven different titles with varied job duties in two separate divisions of PGW and across five locations in which no less than six decision-makers independently included them in the RIF.  *See* PGW's Br. in Support, ECF No. 289 at 12-15.  To be sure, the five Representative Plaintiffs are only representative of the impact that the RIF had in Harmarville where none of the four Opt-in Plaintiffs worked.

---

18.  The *Zavala* Court seemingly cited to a former edition of this source, as § 2184 in the more recent volume provides an overview of pro se complaints.  Nonetheless, that provision is now set forth in § 2142.  *See* 45C Am. Jur. 2d Job Discrimination Correlation Table at 2.

More specifically, Karlo was a Sr. Engineering Specialist; McLure, Meixelsberger, and Cunningham were Sr. Technical Assistants in, respectively, soldering, windshield bending and the sidelight process; and Marietti was a Sr. C/M Specialist in Tooling & Instrumentation. By contrast, the four remaining Opt-in Plaintiffs had varying employment circumstances: (1) Breen worked under Skeen in OEM at the Crestline Plant as a Production Supervisor; (2) Clawson worked under Holmes in OEM at the Evansville Plant as a Project Engineer; (3) Shaw worked under Wysseier in ARG at LYNX's Pittsburgh location as a Marketing Manager; and (4) Titus worked under Fencak in ARG at PGW Auto Glass in Irving, TX as an Area Services Manager. Simply put, "[t]he similarities among the proposed plaintiffs are too few, and the differences among the proposed plaintiffs are too many" to justify final certification. *Zavala*, 691 F.3d at 537-38.

As the record makes clear, neither the high-level management decision to implement the RIF nor its purported flaws provide the necessary factual nexus to move forward as a collective action. Plaintiffs were each selected for termination on a decentralized basis at the discretion of local unit managers. Many of the RIF deficiencies cited by Plaintiffs varied from manager to manager and location to location. And, while the nonuse of PPG's RIF guidelines was universal, that perceived shortcoming is not sufficient to bind the collective together in light of the substantial dissimilarities between the Representative and Opt-in Plaintiffs.

The existence of individualized defenses and procedural concerns likewise favor decertification. *See Zavala*, 691 F.3d at 537 ("Plaintiffs may also be found dissimilar based on the existence of individualized defenses."); *see also Aquilino v. Home Depot, U.S.A., Inc.*, CIV.A. 04-04100 PGS, 2011 WL 564039, at **8-11 (D.N.J. Feb. 15, 2011); *Lugo*, 737 F. Supp. 2d at 316. For example, PGW may have legitimate, non-discriminatory reasons for each

termination and representative testimony would do little to streamline this action when individual determinations would still remain. In the end, the so-called similar claims would actually require nine separate inquiries into liability as well as individual damages calculations as to each Plaintiff given their differing ages and salaries.

Plaintiffs simply have not shown, by a preponderance of the evidence, that the Opt-in Plaintiffs are similarly situated to the Representative Plaintiffs. As other courts have recognized, substantial variances among plaintiffs' day-to-day job duties and employment settings weigh in favor of decertification. *See, e.g.*, *Kuznyetsov v. W. Penn Allegheny Health Sys.*, Inc., CIV.A. 10-948, 2011 WL 6372852, at **4-5 (W.D. Pa. Dec. 20, 2011). This Court faces a similar record. *See also Martin v. Citizens Fin. Grp., Inc.*, CIV.A. 10-260, 2013 WL 1234081, at **5-6 (E.D. Pa. Mar. 27, 2013)*; Lusardi v. Xerox Corp.*, 118 F.R.D. 351, 356-57 (D.N.J. 1987). Accordingly, the Court will decertify the putative collective action.

### 3. Disparate Treatment

Claims brought under the ADEA may proceed pursuant to a disparate impact or a disparate treatment theory. *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 232-43 (2005). In the First Amended Complaint, Plaintiffs assert a claim for disparate treatment at Count One and a claim for disparate impact at Count Two.

PGW submits that Plaintiffs cannot salvage their collective action by characterizing it as a disparate treatment case, arguing that they failed to develop in discovery how the RIF was intended to target older workers – a necessary element of this theory. *See* PGW's Br. in Support, ECF no. 289 at 27; *see generally Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). PGW also maintains that this action was conditionally certified only on the disparate impact claim, foreclosing Plaintiffs ability to proceed with a collective action on a disparate treatment theory.

Plaintiffs contend that conditional certification was granted on both grounds. Although they recognize that disparate treatment is never discussed in the Memorandum Opinion, Plaintiffs suggest that the court must have meant to certify this action on both grounds because the Order is silent as to the theory upon which conditional certification was granted. Plaintiffs also identify what they developed in discovery to support this claim: "evidence about age bias in PGW's corporate culture, stemming both from PPG and Kohlberg."[19]

This Court disagrees. First, conditional certification was granted only as to the disparate impact claim. There, the court carefully noted the different context of impact and treatment case authorities to which it cited. *See, e.g.*, Mem. Op., ECF No. 179 at 12 ("Although that case was, admittedly, decided in the context of a disparate treatment claim . . . ."). Second, counsel for Plaintiff has characterized the collective action as only a disparate impact claim on multiple occasions. As counsel argued at the hearing on the motion for conditional certification:

> Your honor, there's no blending. We simply allege that there is disparate impact in this case in large measure because of the nature of the organization, history of the organization, the fact that the corporate down-sizer came in, and said to the senior managers just go ahead, terminate employees. You don't have to look at performance history. You don't have to look at tenure. You don't have to apply any objective HR standards. You don't have to do a disparate impact analysis. You can just pick whoever you please, except make sure they're adaptable going forward. That was the guidance that was given, Your Honor. We think that states a disparate impact claim that's totally distinct from a disparate treatment claim.

Oral Arg. Tr., ECF No. 176 at 34. *See also* Status Conf. Tr., ECF No. 291, at 28 ("[Counsel for Plaintiffs]: Your Honor, we can make an attempt to do that certainly, but it really is not a fair

---

19. Plaintiffs make frequent reference to Kohlberg, Kravis and Roberts ("KKR"), Kohlberg, and PPG throughout their filings. By way of background, KKR is a global investment firm apparently known for its leveraged buy-outs. Among others, KKR was founded by Jerome Kohlberg Jr. who later left to start Kohlberg & Co. Plaintiffs contends that the so-called "traditions" established by KKR continued at Kohlberg and that Wiggins began to institute its purported practice of "packaging and 'flipping' a company for a quick profit" after Kohlberg acquired PPG's automotive glass assets. *See generally* Pls.' Br. in Opp., ECF No. 300 at 3 n.5.

question directed at Plaintiffs. It's not relevant to their theory the case. Their theory of the case was that there was disparate impact in this massive RIF that was performed . . . .").

Most importantly, even if the court had conditionally certified an over-fifty disparate treatment collective, Plaintiffs would still need to show by a preponderance of the evidence that they were "similarly situated." They have not done so. Plaintiffs bring forward insufficient evidence to bind the putative collective together and instead rely upon isolated comments and unsupported assertions about other companies and society in general. Moreover, PGW highlight that Plaintiffs have yet to depose or seek discovery from PPG or Kohlberg to support their alleged claim of an ageist corporate culture. At this stage of the proceedings, this dearth of factual support is not sufficient to support final certification.

### 4. Effect of Decertification

The law makes clear that, upon decertification, the opt-in plaintiffs are dismissed without prejudice. *See Myers*, 624 F.3d at 555 (citing *Family Dollar*, 551 F.3d at 1261; *Hipp*, 252 F.3d at 1218). Should the Opt-in Plaintiffs refile their cases as individual actions, they must be mindful of how the single filing rule may impact their claim, *see Ruehl*, 500 F.3d at 382-91, and cognizant of statute of limitations issues, *see Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1391 (11th Cir. 1998). Accordingly, the Court will dismiss the claims of Breen, Clawson, Shaw and Titus without prejudice.

The Court will not, however, dismiss the Representative Plaintiffs' claims. *See Alvarez v. City of Chicago*, 605 F.3d 445, 450 (7th Cir. 2010) ("When a collective action is decertified, it reverts to one or more individual actions on behalf of the named plaintiffs."); *Fox v. Tyson Foods, Inc.*, 519 F.3d 1298, 1301 (11th Cir. 2008) (affirming decertification of an FLSA collective action, dismissal of the opt-in plaintiffs without prejudice, and severance of each of the

named plaintiffs into separate individual actions); *see also Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 877 (7th Cir. 2012); *White v. Baptist Mem'l Health Care Corp.*, 08-2478, 2011 WL 1883959, at *4 (W.D. Tenn. May 17, 2011) (collecting cases). Therefore, Karlo, McLure, Cunningham, Marietti, and Meixelsberger may proceed with their claims.

### B. Renewed Motion for Leave to Amend

Plaintiffs move for leave of Court to file their Second Amended Complaint in which they seek to make certain stylistic and organizational revisions, conform their pleading to the evidence developed in discovery, and remove allegations relating to Plaintiffs who have settled.

PGW opposes the substantive aspects of the motion on three grounds. First, it argues that the proposed amendments include irrelevant material regarding nonparties KKR and Kohlberg. Second, PGW alleges that Plaintiffs include new allegations that are controverted by the evidence developed in discovery. Third, PGW attacks Plaintiffs' attempt to insert disparate treatment claims as part of the collective action.

The Court will grant in part and deny in part the renewed motion for leave to amend. Of course, counsel may clean up the pleadings, remove the parties no longer part of this litigation, and conform their complaint(s) to this Memorandum Opinion. The same applies for the Opt-in Plaintiffs who may choose to refile suit. Plaintiffs may not, however, include irrelevant averments regarding KKR or Kohlberg. *See, e.g.*, Pls.' Proposed Sec. Am. Compl., ECF No. 299-1 at 4, ¶¶ 19, 20 ("19. Kohlberg is a Chicago-based private equity firm with $8.0 billion in assets. It was founded by Jerome Kohlberg, Jr., the investment banker who is the son of one of the founders of KKR (Kohlberg, Kravis and Roberts), the leveraged buy-out firm notorious for its controversial practices involving downsizing of companies acquired by it in the junk-bond era. Those traditions established by KKR continued at Kohlberg."). Plaintiffs also may not

expand the scope of this litigation by amendment, which would only further delay the resolution of this case. The disparate treatment theory was not part of the collective action conditionally certified, and this Court will not restart that aspect of this case on new grounds.

Whether Plaintiffs may maintain disparate treatment claims in their individual capacity presents a more difficult question. PGW adamantly maintains that "there is no evidence in the record that [it] engaged in a single 'intentionally discriminatory' practice that affected each of the Plaintiffs," that there is no evidence that it engaged in a "pattern or practice" of intentional discrimination, and that allowing Plaintiffs leave to file the Second Amended Complaint will further complicate this litigation requiring further briefing. *See* Resp. in Opp. ECF No. 308 at 7-8. PGW is free to file dispositive motions on the disparate treatment claim(s).

The remaining disputes are over Paragraphs 41, 50, 57, 63, 89-91, and 98. Paragraphs 41, 50, 57, 63 pertain to Plaintiffs' view that the P&LP's were "suspended" during the three years before the March 2009 RIF. PGW opposes this characterization and attaches documentary evidence that shows a review for Clawson weeks before his termination. To the extent that Plaintiffs' broad attribution does not apply across-the-board, they should further amend their allegations regarding the "suspension" of the P&LP's. Paragraphs 89-91 concern Plaintiffs' contention that they were given incomplete DUMS in connection with their severance agreement, and Paragraph 97 sets forth the alleged RIF deficiencies. These matters are disputed issues of fact, which the Court cannot decide at this time.

Accordingly, the motion for leave will be granted in part and denied in part. The Named Plaintiffs shall file their pleading(s) on or before April 21, 2014.

## IV.	Conclusion

For the reasons hereinabove stated, the Court will grant in part and deny in part PGW's motion for decertification; grant in part and deny in part Plaintiffs' renewed motion for leave to file a Second Amended Complaint; and deny as moot and without prejudice Defendant's expert challenges and Plaintiffs' motion to strike motions to bar expert testimony.

An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RUDOLPH A. KARLO, MARK K. MCLURE, WILLIAM S. CUNNINGHAM, JEFFREY MARIETTI, DAVID MEIXELSBERGER, BENJAMIN D. THOMPSON and RICHARD CSUKAS,** *on behalf of themselves and all others similarly situated*, <br><br> **Plaintiffs,** <br><br> **vs.** <br><br> **PITTSBURGH GLASS WORKS, LLC,** <br><br> **Defendant.** | ) ) ) ) ) ) ) ) ) ) ) ) ) <br> **2:10-cv-1283** |

## ORDER OF COURT

AND NOW, this 31st day of March, 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** as follows:

(1) DEFENDANT'S MOTION FOR DECERTIFICATION OF THE PROPOSED COLLECTIVE ACTION (ECF No. 288) is **GRANTED IN PART AND DENIED IN PART** and the claims of Opt-in Plaintiffs Michael Breen, Matthew Clawson, Stephen Shaw, and John Titus are **DISMISSED WITHOUT PREJUDICE**;

(2) PLAINTIFFS' RENEWED MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT (ECF No. 299) is **GRANTED IN PART AND DENIED IN PART**;

(3) DEFENDANT'S MOTION TO BAR PROPOSED EXPERT TESTIMONY OF ANTHONY G. GREENWALD RELATED TO PURPORTED IMPLICIT SOCIAL BIAS (ECF No. 316) is **DENIED AS MOOT AND WITHOUT PREJUDICE**;

(4) DEFENDANT'S MOTION TO BAR DR. CAMPION'S EXPERT OPINION ON REASONABLE HUMAN RESOURCE PRACTICES (ECF No. 317) is **DENIED AS MOOT AND WITHOUT PREJUDICE**;

(5) DEFENDANT'S MOTION TO BAR DR. MICHAEL CAMPION'S STATISTICAL ANALYSIS (ECF No. 318) is **DENIED AS MOOT AND WITHOUT PREJUDICE**;

(6) DEFENDANT'S MOTION TO BAR EXPERT OPINION OF DAVID DUFFUS REGARDING THE O'DONOGHUE EXPERT REPORT (ECF No. 319) is **DENIED AS MOOT AND WITHOUT PREJUDICE**; and

(7) PLAINTIFFS' MOTION TO STRIKE MOTIONS TO BAR EXPERT TESTIMONY (ECF No. 323) is **DENIED AS MOOT AND WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the caption in this matter is hereby **AMENDED** as follows:

|  |  |  |
|---|---|---|
| **RUDOLPH A. KARLO, MARK K. MCLURE, WILLIAM S. CUNNINGHAM, JEFFREY MARIETTI, and DAVID MEIXELSBERGER,** | ) ) ) ) | **2:10-cv-1283** |
| **Plaintiffs,** | ) ) |  |
| **vs.** | ) ) |  |
| **PITTSBURGH GLASS WORKS, LLC,** | ) ) |  |
| **Defendant.** | ) ) |  |

BY THE COURT:

<u>s/Terrence F. McVerry</u>
United States District Judge

cc:    Andrew J. Horowitz
       Email: andrew.horowitz@obermayer.com
       Bruce C. Fox
       Email: bruce.fox@obermayer.com
       Yuanyou Yang
       Email: yuanyou.yang@obermayer.com

       Tina C. Wills
       Email: twills@freebornpeters.com
       David S. Becker
       Email: dbecker@freebornpeters.com
       Jeffrey J. Mayer
       Email: jmayer@freebornpeters.com
       Jennifer L. Fitzgerald
       Email: jfitzgerald@freebornpeters.com
       John T. Shapiro
       Email: jshapiro@freebornpeters.com
       Nancy L. Heilman
       Email: nheilman@cohenlaw.com
       Robert B. Cottington
       Email: rcottington@cohenlaw.com
       Robert F. Prorok
       Email: rprorok@cohenlaw.com

       (via CM/ECF)