## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RUDOLPH A. KARLO, MARK K. MCLURE,
WILLIAM S. CUNNINGHAM, JEFFREY
MARIETTI, and DAVID MEIXELSBERGER,

      Plaintiffs,

      vs.

PITTSBURGH GLASS WORKS, LLC,

      Defendant.

)
)
)
)   **2:10-cv-1283**
)
)
)
)
)
)
)

### MEMORANDUM OPINION AND ORDER OF COURT

Pending before the Court are a MOTION FOR SUMMARY JUDGMENT ON THE

PLAINTIFFS' INDIVIDUAL DISPARATE TREATMENT CLAIMS (ECF No. 372); a

MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFFS' INDIVIDUAL

DISPARATE IMPACT CLAIMS (ECF No. 374); a MOTION FOR SUMMARY JUDGMENT

ON PLAINTIFF KARLO'S AND PLAINTIFF MCLURE'S RETALIATION CLAIMS (ECF

No. 377); and a COMBINED MOTION TO STRIKE UNSUPPORTED FACTS AND DEEM

IMPROPERLY CONTESTED FACTS ADMITTED (ECF No. 417), filed by Defendant

Pittsburgh Glass Works, LCC ("PGW"). The issues have been fully-briefed by Plaintiffs

Rudolph A. Karlo, Mark K. McLure, William S. Cunningham, Jeffrey Marietti, and David

Meixelsberger and Defendant PGW in their memoranda (ECF Nos. 373, 375, 378, 386, 387, 396,

400, 401, 408, 409, 411, 418, 422, 424, 425, 426). Also, the factual record has been thoroughly

developed via their respective Concise Statements of Material Facts ("CSMF"),

Responsive/Counter Statements of Facts ("RSOF"/"Counter-CSMF"), appendices and exhibits

(ECF Nos. 376, 379, 388, 389, 390, 397, 398, 402, 403, 404, 405, 410, 412).[1]  Accordingly, the

motions are ripe for disposition.

## I.  Background[2]

### A.  Factual Background

The following background is taken from the Court's independent review of the motions

for summary judgment, the filings in support and opposition thereto, and the record as a whole.

---

1.  The parties filed one set of Concise Statements of Material Facts and Responsive/Counter Statements of Facts with regard to the disparate treatment and disparate impact claims and another set with regard to the retaliation claims.  The Court will distinguish between these filings where appropriate.

2.  PGW moves the Court to strike unsupported facts and deem improperly contested facts admitted based on Plaintiffs' noncompliance with Local Civil Rule of Court 56, specifically their failure to support their statements and denials with citations to the record.  For example, in numerous instances, Plaintiffs set forth a boilerplate objection, fail to include any citation to the record as mandated by the Local Civil Rules of Court, and incorporate by reference "general objection no. 2," which states as follows

> In particular, given even a modicum of scrutiny, Defendant's "undisputed" facts are, for the most part, impermissible suppositions and inferences based upon the self-serving testimony of Defendant defense [*sic*] witnesses, which should be disregarded even if uncontradicted to the extent that the jury is not required to believe them pursuant to *Hill v. City of Scranton*, 411 F.3d 118, 129 n.16 (3d Cir. 2005) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000)).

Pls.' RSOF to Def.'s Suppl. CSMF at 2, ECF No. 404 (disparate treatment and disparate impact claims);; *see also*; Pls.' RSOF at 2, ECF No. 398 (retaliation claims); Pls.' RSOF re Def.'s Mot. for Decert. at 2, ECF No. 403 (disparate treatment and disparate impact claims).  Elsewhere, Plaintiffs simply cite to their Complaint to support various paragraphs in their Counter-CSMF.  *See, e.g.*, Pls.' Counter-CSMF at 1-4, ECF No. 402 (disparate treatment and disparate impact claims).  To the Plaintiffs, "[n]othing about these paragraphs should impede the Court in deciding the pending Motions for Summary Judgment," for "[they] are in compliance with the applicable rules substantially (if not completely)."  Pls.' Br. in Opp. at 4, ECF No. 418.  The Court has a different view.  To be sure, the Local Rules are not suggestions that may be disregarded at counsel's whim or convenience; they instead represent mandatory requirements which establish a fair and level playing field for all parties.  *See* LCvR 56.B.1. ("A party *must* cite to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record supporting the party's statement, acceptance, or denial of the material fact."); LCvR 56.C.1.b ("[T]he opposing party shall file . . . A separately filed concise statement, which responds to each numbered paragraph in the moving party's Concise Statement of Material Facts by: . . . setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety (as to whether it is undisputed or material), *with appropriate reference to the record* (See LCvR 56.B.1 for instructions regarding format and annotation)) (emphasis added); *see also Bethea v. Roizman*, No. CIV. 11-254 JBS/JS, 2012 WL 4490759, at *7 (D.N.J. Sept. 27, 2012) ("Merely citing to the pleadings is insufficient to support a motion for summary judgment").  Be that as it may, the Court is reluctant to resolve the motions for summary judgment based on a procedural technicality rather than merits of the claims, and therefore, it will deny PGW's motion. Accordingly, the Court has conducted an independent review of the record and has included those facts that are material, supported by the evidence and otherwise admissible at trial.

As the law requires, all disputed facts and inferences are resolved in favor of Plaintiffs, the non-moving parties.

### 1. The Formation of PGW

PGW was formed on October 1, 2008 from the auto-glass assets of PPG Industries, Inc. ("PPG"). PPG initially retained a forty-percent ownership in PGW; Kohlberg & Company ("Kohlberg"), a private equity firm, owned the remaining sixty-percent and later acquired the remainder of PPG's interest in the venture. James Wiggins, a Kohlberg principal, became Chairman and CEO of PGW.

One of PGW's core businesses is the production of automotive glass for car and truck manufacturers as an original equipment manufacturer ("OEM"), for which it maintains a Manufacturing Glass Technology Department ("Manufacturing Technology") in Harmarville, Pennsylvania where the five Plaintiffs were employed. Aside from OEM, PGW consists of GTS Services, a software business ("GTS"); PGW Auto Glass ("AG"), an automotive-replacement-glass distribution business ("ARG"); LYNX Services, an insurance claims administrator ("LYNX"); and Aquapel, a glass treatment supplier. At the corporate level in Pittsburgh, Pennsylvania, PGW's businesses share departments for finance, IT, and Human Resources, functions previously staffed by PPG and provided to PGW by contract during a transition period.

### 2. The Decline of the Automobile Industry

Around the time that PGW was formed, General Motors, Ford, and Chrysler (the "Big Three" automobile manufacturers) appeared before the United States Congress to request bailout funds. Given the direction of the industry and economic forecast, PGW took several steps to combat deteriorating sales: it closed two manufacturing facilities in Canada and another in Evart, Michigan; consolidated distribution systems; identified about $100–$200 million of necessary

capital expenditures; reconfigured its distribution strategy; commenced process improvement actions; and undertook supply chain optimization. PGW also terminated the employment of roughly ten to twelve percent of its salaried workforce in early December 2008. The decision for this reduction in force ("RIF") was made by Wiggins in consultation with his leadership team, forty-five to fifty persons in senior management positions at PGW. The decisions regarding the positions to eliminate were, however, left to the discretion of the individual directors who were assigned a targeted percentage by which they were directed to reduce their workforce.

PGW undertook several additional measures in early 2009 to meet the challenges of the lower demand: it put hourly employees on temporary layoff; it operated its largest plant (Evansville) for only four of the thirteen weeks in the first quarter; it trained leadership at each plant in Lean Six Sigma principles; it suspended merit salary increases; it implemented a hiring freeze except for critical positions; it suspended a 401k matching contribution program and bonuses; and reduced salaries company-wide.

### 3. The March 2009 RIF

Kevin Cooney became Acting HR Director for PGW after the former Vice President of Human Resources resigned from the company sometime in late–2008 or early–2009.[3] Around mid-February 2009, Wiggins asked Cooney to take a "fresh look" at the organization and formulate a reorganization plan.

Cooney enlisted the assistance of a consultant, Ed Dunn, an organizational specialist to make recommendations regarding restructuring of the company into a more lean and effective organization. Dunn later prepared an "Organization Assessment" presentation and a summary of his observations/recommendations, which Cooney reviewed before finalization. In his

---

3. Robert McCullough permanently filled the position in September 2009. At PGW, McCullough (an attorney) performed certain legal duties that would normally have been carried out by general counsel in labor and employment matters.

memorandum, Dunn noted that "[m]arket conditions continue to deteriorate and more cost reductions are required as soon as possible[,] and this would include certain organization changes;" that "[i]t would not be efficient or effective at this time to undertake a formal or time-consuming organization study or process;" and that "[i]nstead, the Executive Team . . . would do an ASAP organization assessment and identify cost-saving organization structure changes to be made that are in addition to the changes and reductions already identified."  Pls.' Counter-CSMF, App'x Ex. L at 1, ECF No. 405-12 (disparate treatment and disparate impact claims); *see also id.* ("The mindset needs to be: Be bold and aggressive. Risk going too far, too fast . . . verses the opposite.  We can revisit and re-load as needed when conditions and results improve.") (ellipses in original).  These suggestions were not binding on PGW, and Dunn had no role in the decision-making process or implementation of later reductions.

By early-March 2009, PGW decided to conduct another RIF.  Although this decision was made by Wiggins and upper management, the employees were selected for termination by their respective managers and directors throughout the company's various operating units.  PGW did not specifically train its directors with regard to the RIF, employ any written guidelines or policies as to how they were to conduct the RIF, conduct any disparate impact analysis of the RIF, review the prospective RIF terminees with in-house or outside counsel, or document why any particular employee was selected for inclusion in the RIF.[4]  The upper management instead issued another generalized directive for each department to cut a targeted percentage from their

---

4.  According to Plaintiffs, PPG had in place a company-wide system for conducting RIFs among its salaried employees, which PGW did not follow in conducting the March 2009 RIF.  Citing to the deposition transcripts of Diana Jarden and Kevin Cooney, Plaintiffs further contend that PGW followed PPG's RIF guidelines three months earlier, in December 2008.  PGW objects to the purported RIF guidelines as an unauthenticated third-party document and highlights that it is dated October 30, 2000, marked CONFIDENTIAL, and appears to be from a production in an unrelated action involving PPG.  *See* Pls.' Counter-CSMF, App'x Ex. M, ECF No. 405-13 (disparate treatment and disparate impact claims).  PPG also objects to Plaintiffs' suggestion that PGW followed the RIF guidelines in December 2008 because Plaintiffs fail to include the cited deposition transcripts in the record and otherwise misstate the cited testimony.  Either way, the Court does not consider this disputed fact—whether PGW used the RIF guidelines of its former parent company in March 2009—as material.

budget, a downsizing with which each unit director had to comply.  *See* Dep. of Cooney, July 26, 2011 at 40:12-14, ECF No. 405-9 ("[I]t became clear that the target was going to be about a 30-percent reduction in jobs, not people, but jobs.").  Thus, the unit directors in the company were afforded broad discretion in determining which of their reports to select for the RIF.

On March 31, 2009, PGW terminated approximately one-hundred salaried employees, affecting over forty locations and/or divisions of the company.  Moreover, the RIF impacted almost every part of the company with the widespread job cuts: forty-four from ARG at over twenty locations; twenty-four from OEM plus seven from Manufacturing Technology, one from Satellite Engineering, and two from Enterprise Excellence; thirteen from ARG Truckload & Services; eight from the company's sales organization; and one from New Product Development.  PGW also closed the Evart, Michigan plant on March 31, 2009, leading to the elimination of eighteen salaried employees.

As part of the RIF, a PGW Human Resources employee with a long tenure at PPG, Diana Jaden, was tasked by Cooney to consolidate data from various locations and unit managers, calculate the amount of severance, identify those who were impacted, and prepare paperwork for the exit interviews.  The paperwork included a cover letter that explained that the individual was being terminated and outlined the severance being offered; a "Separation Agreement and Release" that employees could sign to receive certain benefits in exchange for waiving their right to bring a claim against PGW; and two multi-page documents with Decisional Unit Matrices ("DUM(s)") per the Older Workers' Benefit Protection Act ("OWBPA").

### 4.  The Manufacturing Glass Technology Department

Gary Cannon was the Director of Manufacturing Technology in March 2009.  Within this group, Jim Schwartz supervised Cunningham; David Perry supervised Marietti; Phillip Sturman,

supervised Karlo and Meixelsberger; and Julie Bernas, supervised McLure. Otherwise, Schwartz, Perry, Sturman, and Bernas were all Cannon's direct reports.

Before the RIF, Manufacturing Technology was comprised of twenty-seven salaried associates. Of those employees, Cannon selected six for termination in the March 2009 RIF, which included Karlo, McLure, Cunningham, Marietti and Meixelsberger.

### i.      Karlo

Karlo began working for PPG in its automotive glass division in 1978 as a Construction and Maintenance Research Specialist II. Throughout his thirty-year career, he received several promotions: to Senior Technical Assistant in 1990, to Engineering Specialist in 1995, and finally to Senior Engineering Specialist in 2001, a position he maintained to his termination. His job duties included working in and later supervising the "mold shop" in which tools for bending glass are built. Karlo also helped to develop eight (8) shared patents, and he received commendations, pay increases, and bonuses, as well as positive reviews in his annual employee evaluation process, referred to as the Performance & Learning Plan ("P & LP"). Compliance with the P & LP process waned somewhat at PPG in the three years before the RIF, particularly as the sale of its glass assets drew near. PGW did not reinstitute the P & LP evaluation process, but earlier documents dating back to 1992 demonstrate that Karlo "meets" or "meets +" expectations or "Exceeds Requirements."

### ii.      McLure

McLure started his career with PPG as a contractor at the Glass Research & Technology Laboratory ("GRTL") in 1975 and became a full-time employee the following year. McLure later worked at PPG's Fiberglass Research facility in O'Hara Township during which he was promoted to Senior Technician in 1990. PPG closed that facility in 1999 and slated McLure for

a transfer to North Carolina. McLure instead pursued another opportunity within PPG at its Harmarville facility where he eventually became a Senior Technical Assistant. As an employee in this division, McLure was responsible for conducting validation testing, traveling to satellite facilities, and providing customer support and technical services at the facilities. Throughout his thirty-four-year career, McLure received positive P & LP evaluations, regular salary increases, bonuses and commendations and worked as a named contributor on a patent developed for PPG.

### iii. Cunningham

Cunningham joined PPG's Glass Research & Development Center in Harmarville as a contract employee and became a full-time employee in 1996. The majority of his work effort was initially devoted to the Laminated Glass Project on which he worked from its validation study through testing until the final product, known as Sungate Coated Laminate, was ready for manufacture at PPG's facilities in Crestline and Tipton. Based on his contributions to this project, Cunningham was promoted in 2004 to Senior Technical Assistant in the OEM New Product & Process Development Group. His job duties in this capacity were to preform measurements of glass, process and variables; analyze the data; and compile reports. Throughout his career, Cunningham received positive P & LP evaluations, annual salary increases, and merit bonuses.

### iv. Marietti

Marietti began his career at PPG as a contract employee in the construction and maintenance shop at the Harmarville automotive glass facility in 1984, and he transferred to the Mold Shop in 1990. In 1994, Marietti became a full-time PPG employee and became a Construction & Maintenance ("C & M") Research Specialist II. Marietti was promoted in 1996 to C & M Research Specialist I and again in 2002 to Senior C & M Specialist Tooling &

Instrumentation in the OEM Technology Transfer Group. Although his job title remained the same, Marietti was given greater responsibility in 2003 when he began to perform the job functions of a Technical Assistant, a role in which he continued until the RIF. His job duties were to perform measurements of glass, process variables; analyze the data; and compile reports. Throughout his career, Marietti received positive P & LP evaluations.

<h3 style="text-align:center">v.     Meixelsberger</h3>

Meixelsberger started at PPG in 1987 and developed into an industry-leader in the windshield bending process over the next twenty-two years. Throughout his career, Meixelsberger received positive P & LP reviews and commendations, including having been hand-selected by Cannon to serve in a specialized manufacturing group comprised of five employees. His last position was as Senior Technical Assistant Windshield Bending in which his duties included working on windshield on the bending lehr, developing sample parts for customers, and troubleshooting in the field where his specialized services were in high demand.

<h3 style="text-align:center">5.   The Termination of Plaintiffs</h3>

On March 31, 2009 Cannon held a meeting with the Plaintiffs and their respective supervisors to inform them of his decision. Throughout, Cannon apparently read from prepared notes (also referred to as the "script") and scrambled to collect the correct paperwork to distribute with their severance packets. Ultimately, Plaintiffs were provided a package of documents, which included an incomplete DUM.

After the meeting, Karlo spoke privately with Cannon to inquire into why he was selected for termination, during which Cannon allegedly made comments regarding Karlo's "adaptability." As Karlo later testified:

> I also feel that at the end of our meeting, in the conclusion of our termination
> meeting, I asked Gary Cannon if I could have a word with him, and he said, yes,

you can, and we went out in the hallway and I asked him why I was being let go. Gary says, well, I don't see you -- we don't see you moving forward with the company as it moves forward, and he proceeds to say -- I'm trying to think his wording, how he said that -- younger employees -- he said, the employees that are left are more adaptable than you, which really upset me, and the first thing that crossed my mind is yeah, what he's referring to is probably the younger employees, they're more adaptable moving forward with the new company.

Dep. of Karlo, July 11, 2011 at 12:21-25–13:1-4, ECF No. 405-1; *see also* Dep. of Karlo, July 17, 2012 at 166:20-24, ECF No. 410-2 ("Well, exactly what Gary said to me when I talked to him in the hallway about, you know, he didn't see me moving forward and, you know, there's people left that's [*sic*] more adaptable. You know, this went on all the time.").[5]  Cannon does not recall the specifics of this conversation. *See* Dep. of Cannon, Jan. 31, 2012 at 70 ("I may have used the word adaptable. I can't recall. If I used the word adaptable, the choice was that I had two gentlemen, Mr. Lampman and Mr. Nolan, who were both older and had engineering degrees and had breadth of process knowledge that I felt were greater than what Rudy [Karlo] had at the time.").

---

5.   Counsel for Plaintiffs' interpretation and use of Cannon's alleged comments about Karlo's so-called "adaptability" has been somewhat of a moving target. In his EEOC Charge, Karlo stated as follows: "We went out in the hall and I asked Gary why I was chosen and he simply said, 'I didn't fit in to the company's future' as they went forward and the people that were left were 'more adaptable than me.'" Pls.' Compl., Ex. A at 16, ECF No. 1-3. In their Second Amended Complaint, Plaintiffs state: "After his termination session, Karlo questioned his supervisor, Gary Cannon, why he was being let go. Cannon's response was that the retained employees were more 'adaptable' than him and that 'we don't see you moving forward with the company as it moves forward.'" Pls.' Sec. Am. Compl. at 8, ECF No. 344. More recently, however, in their summary judgment filings, Plaintiffs (re)-interpret Karlo's deposition testimony regarding his conversation with Cannon to mean that PGW "was seeking to retain employees who were considered to be younger and more 'adaptable' than him." Pls.' Counter-CSMF at 4, ECF No. 402 (disparate treatment and disparate impact claims). And in pursuing their narrative, Plaintiffs manufacture this statement by selectively quoting the transcript of Karlo's deposition testimony (and distort its meaning in doing so)—a tactic that does not create a genuine dispute of material fact. *See* Pls.' RSOF re Def.'s Mot. for Decert. at 16, ECF No. 403 (disparate treatment and disparate impact claims) ("Additionally, Karlo testified that Cannon specifically admitted to that him age was the criteria he used in selecting employees for termination: 'we don't see you moving forward the company as it moves forward, . . . – younger employees . . . that are left are more adaptable . . . .'") (ellipses in original); *see also* Pls.' Br. in Opp. at 3, ECF No. 401 ("By telling Karlo that he was selected for the RIF because he believed that younger employees were more adaptable, Cannon—the decision maker with respect to all Plaintiffs—was admitting that he selected Karlo for the RIF because of his age, direct evidence of illegal discrimination under the ADEA.") (emphasis in original) (citing Pls.' Counter-CSMF at 4, ¶¶ 19-20, ECF No. 402 (disparate treatment and disparate impact claims)); Pls.' Surreply at 2, ECF No. 425 ("Simply put, Karlo said that he was told by Cannon that younger employees were retained in the RIF because they were viewed as more adaptable."). In its effort to clarify Karlo's statement, PGW has submitted a video clip of the relevant testimony from his deposition. *See* Def.'s Reply Br. at 3, ECF No. 408.

For his part, Cannon contends that he objectively evaluated the group as a whole and independently decided to release certain employees based on the needs of his department, insisting that he never considered age in the process.[6] *See generally* Decl. of Cannon at 2, ECF No. 290-38, Dep. of Cannon, Jan. 31, 2012 at 49, ECF No. 290-35. Moreover, Cannon decided that Karlo could be terminated allegedly because most of his work was already being outsourced and the remainder of his ongoing tasks could be handled by Irv Wilson, an engineer in Manufacturing Technology, and John Bender, a technician in Manufacturing Technology with an expertise in instrumentation. *See generally* PowerPoint Presentation – Operations Organization Restructuring March 2009, Revised 3/25/09 at 35, 37 ECF No. 290-7 (depicting the organizational structure of Manufacturing Technology before and after the RIF). Cannon allegedly applied the same rationale—*i.e.*, Wilson and Bender could absorb the work—to McLure and to Meixelsberger. In addition, Cannon decided to include Cunningham and Marietti in the RIF allegedly because their ongoing tasks could be absorbed by engineers, Mike Fecik and Jim Schwartz along with Tom Cleary. *See generally id.*

As of the date of their (initial) terminations, Karlo was 51.36 years old, McLure was 54.83 years old, Cunningham was 52.58 years old, Marietti was 55.33 years old, and Meixelsberger was 52.73 years old. Irv Wilson (age 59.41) and John Bender (age 54.15) are older than (or nearly the same age as) Karlo, McLure, and Meixelsberger. Mike Fecik (age 57.73) and Tom Cleary (age 59.62) are older than Cunningham and Marietti; Jim Schwartz (age 51.24) is, respectively, one and four years their junior.

---

6. According to Cannon, he did not receive any specific direction from upper management regarding how he was to arrive at his decisions or any assistance from other PGW employees with the exception of Jarden who only put together the severance packages for the terminated individuals. Cannon also did not use a forced ranking for his department which was previously compiled with the support of his direct reports, some of whom supervised the plaintiffs. Based on those rankings, Cannon testified that two other employees ranked lower than some of the plaintiffs, but that they were retained based on their specialized skills and knowledge which he deemed vital to his group.

Plaintiffs all point to a single, younger employee who was retained, Steve Horcicak (age 36.49), as the individual who (in their view) should be used as a comparator for their claims. According to Cannon, Horcicak was retained allegedly because he was the sole employee with an expertise in the area of fracture mechanics.

### 6. The Return of Karlo and McLure to PGW

Following the RIF, Karlo and McLure were engaged to work through a third-party contractor to work at PGW's facilities in Creighton and Harmarville. The facts regarding their respective experiences are as follows:

### i. Karlo

On September 11, 2009, John Felker, HR Manager for PGW's Creighton facility and direct report to plant manager Craig Barnette, contacted Karlo to gauge his interest in a "temporary maintenance supervisor" contract position. After some negotiations regarding the hourly rate of his compensation, Karlo accepted the position.

Following their discussions, Felker arranged for Karlo to be brought on board through an outside, third-party contractor, Belcan Corporation, in its Tech Services Division.[7] Kathryn Robinson, a Belcan employee in its Pittsburgh, PA office, thereafter provided Karlo with employment documents, including a W-4 form, an I-9 form, the Employment Handbook, a Drug and Alcohol Policy and Agreement, a Confidential and Intellectual Property Agreement, an Accident Report form, a Direct Deposit Enrollment form, instructions regarding time cards and an Acknowledgement and Agreement Form, which specified that his employment was "at-will"

---

7. Non-party Belcan supplied PGW with "temporary personnel for the performance of certain services at/for certain of [its] facilities" pursuant to a written agreement. Def.'s App'x Ex. 6 at 3, ECF No. 379-7 (retaliation claims). The "Agreement for Temporary Personnel," effective as of January 1, 2009, provided that the "Supplier's relationship with the Buyer under th[eir] Agreement is that of an independent contractor," that the "Supplier shall be solely responsible for its employees, subcontractors and agents and for their benefits, contributions and taxes" and that Supplier's employees shall not be entitled to any of Buyer's employee benefits, including any group insurance, pension and benefit plans, nor shall any benefits be made available to Supplier." *Id.* at 16.

with Belcan. Aside from completing this paperwork, Karlo seemingly had no further contract with Belcan during the course of his employment at PGW's Creighton facility. Nevertheless, Belcan received from Karlo a weekly timesheet that was approved by PGW, withheld his income taxes, paid his compensation, and provided him with employee benefits.

Karlo commenced performing his prescribed serviced at PGW's Creighton facility on September 17, 2009, reporting to PGW Maintenance Manager, Bill Easterlin. Following a three-week orientation program during which he became acquainted with the glass bending lines, maintenance personnel, and the computer program used to track work orders, Karlo became the shift maintenance supervisor for Crew C on the PGW windshield production lines. In that capacity, Karlo oversaw four PGW maintenance employees, assigned work orders, and tracked equipment upkeep and repair. Roughly four months later, Karlo filed a charge of discrimination against PGW with the EEOC on January 22, 2010 related to his termination in the March 31, 2009 RIF.

Around February 1, 2010, Mark Soderberg replaced Barnette as the plant manager of the Creighton facility and implemented a supervisor and crew realignment. As part of the realignment, Karlo became the production supervisor in charge of windshield Line 1 at the plant. As such, he reported to PGW's Line 1 Value Stream Manager, Tom Showers. In his capacity, Karlo's responsibilities included coordinating the production of a marketable windshield, ensuring that the line was properly staffed, and maintaining the equipment and supplies—some of which carried over from his position as a shift maintenance supervisor.[8] From Showers' perspective, Karlo performed his duties in a "thorough and competent fashion." Dep. of

---

8. According to Showers, the realignment resulted in the elimination of maintenance supervisors, whose duties now "fell under the realm of the production supervisors," leading to enhanced responsibilities for individuals in those positions and, in general, everyone else in the facility due to "the new format." Dep. of Showers at 39, ECF No. 399-5.

Showers at 37, ECF No. 399-5; *see also* Dep. of Soderberg at 31, ECF No. 399-6 ("There was a lot of folks in the plant that felt that Rudy would be a good fit [to fill the supervisory opening].").

Sometime after July 1, 2010, Bob Pinchok, PGW's Line 2 Value Stream Manager at Creighton, allegedly approached Karlo following a routine shift meeting and indicated that he wanted to discuss an "issue." As Karlo initially described the interaction:

> A.     Well, as you know, there was an EEOC claim filed, form filed, and I'll get right to the gist of it.
>
> When I was finished coming out of the supervisor's office giving information on a shift, Bob Pinchok approach me -- and this is after the EEOC closed our claim.[9] Bob approached me and said I'd like to talk to you. I said, okay. So we're walking up this little hallway there, and Bob said, well, what I'm about to tell you, I'll deny it all the way, arms going up and everything. He said, there's -- you know everybody want to hire you here, he said, but there's an issue hanging out here. I asked Bob, what are you talking about Bob? What's the issue? He said, you know what I'm talking about. There's an issue out there. I'll deny it all the way I ever even talked to you. And I said, is it the EEOC claim? I don't want to know anything about it.
>
> Maybe I'm getting too radical here.
>
> Mr. Fox: No.
>
> A.     That's what the mannerisms were. And Bob said, you know, if they go away, you'd probably get -- everybody wants to hire you. All you need to do is talk to Mark Soderberg or John Felker. They're waiting to hear from you. I said, I'll think about it. We parted ways.

Dep. of Karlo, July 11, 2011 at 61-63, ECF No. 399-1.[10] However, Karlo later equivocated on whether there was any explicit mention of the EEOC claim during his conversation with Pinchok, first retracting his statement, *see id.* at 65-69 ("I would like to strike from the record

---

9. The EEOC issued its Dismissal and Notice of Rights letters on July 1, 2010. *See* Pls.' Compl., Ex. B. ECF No. 1-4.

10. Plaintiffs claim that Pinchok said "that Karlo just needed to make the whole thing go away'" and "indicated that, if Karlo wanted the job at the Creighton facility, Felker, the HR manager, or Soderberg, the plant manager, would be waiting to hear from Karlo and that Karlo 'knew what he had to do.'" Pls.' Counter-CSMF at 9-10, ECF No. 397 (retaliation claims) (quoting Dep. of Karlo, July 11, 2011 at 61:21-64:10; Pls.' Sec. Am. Compl. at 24-25, ¶¶ 125-126, ECF No. 344). Those purported quotations appear nowhere in Karlo's deposition, but are instead lifted from Plaintiffs' Second Amended Complaint.

that I said EEOC."), before returning to his original version of events, *see id.* at 71-72 ("I believe I mentioned the EEOC charge, yes.").

A "few weeks later," Karlo encountered his supervisor, Showers, in the midst of their workday, during which "Tom g[a]ve[ ] [him] a funny look" and asked him if he had spoken with Pinchok. *Id.* at 63. Karlo questioned whether he was referring to "the issue out there," and Showers responded, "yes, but I don't want to know anything about it." *Id.* Showers also asked Karlo if he had "talk[ed] to anybody" (presumably about "the issue"), and Karlo responded that he had not.

During a shift change "a week or so later," Pinchok approached Karlo to escort him to a meeting with Soderberg and Felker.[11] As they walked down the hallway toward Soderberg's office, Pinchok recounted that he had "tr[ied] to tell [Karlo] [about] this a couple weeks back," which Karlo understood to mean "dropping the lawsuit or dropping the EEOC claim, whatever they had in mind." *Id.* at 64.

At the July 12, 2010 meeting, which lasted only minutes, Soderberg allegedly suggested to Karlo that "you know why you're here" and informed him that "[his] services were no longer needed at PGW Creighton." *Id.* at 72. Soderberg also allegedly indicated that "downtown made the decision," without giving any additional information. *Id.* at 73. The record is, however, unclear as to how exactly Karlo's temporary assignment came to an end. *C.f.* Def.'s CSMF at 8, ECF No. 379 ("Mark Soderberg, the manager of Karlo's temporary assignment, made the decision to end Karlo's contract assignment and not to hire him for a non-contract position . . . . Both Soderberg and [Vice President of Human Resources, Robert] McCullough disliked the use

---

11. The Court recognizes that the timeline of events, as recounted by Karlo, does not "add up" so to speak. That is, Karlo testified that his run-in with Pinchok occurred after the EEOC closed Plaintiffs' claim on July 1, 2010, that his encounter with Showers occurred "a few weeks later," and that his meeting with Soderberg and Felker was "[a] week or so later"—all of which allegedly occurred before his last day on the job on Friday, July 11, 2010. Be that as it may, it is undisputed that this meeting with Soderberg and Felker occurred on July 12, 2012.

of contract supervisors and reasonably believed that hiring permanent, non-contract employees to supervise the hourly workers would be better for PGW."). After his assignment ended, Karlo received over $10,000 in unemployment benefits from Belcan from August through December of 2010.[12]

The same day, PGW brought in on a trial basis three temp-to-permanent production supervisors – Tracy Schaeffer, Raymond Dillard, and Wayne Foley – to replace Karlo, Ed Watson, and Hal Reader – who were filling that position. Among the new hires, Schaeffer left the Creighton facility within weeks, apparently due to its "strong union atmosphere." Dep. of Soderberg at 54, ECF No. 399-6. PGW thereafter posted a job opening on monster.com, which was cross-listed on the website of the Pittsburgh Post-Gazette, for a full-time production supervisor at the Creighton facility. The job posting listed several qualifications required for the position, including "a minimum of three years of manufacturing supervisory experience." Pls.' First Am. Compl., Ex. H, ECF No. 54-8.

Karlo was initially considered for a non-contract supervisor position, but was not hired after Soderberg concluded that he lacked the requisite supervisory experience to fill the role. As Soderberg testified at his deposition,

> The basis was production experience. The plant needed some strong supervisors. There was a need for greater strength in terms of supervision in that plant because of the union atmosphere that was in that plant . . . I felt Rudy did, he did a good job in the production area, or in the maintenance area. He had worked in the production role for -- how many months was it? Five months, maybe. But I honestly felt we needed some new blood, essentially, in the supervisor role.

---

12. Among their factual allegations, Plaintiffs proffer that "[a] few days after his conversation with Soderberg, Karlo was told by John Bender, a process engineer at PGW, that he was told by Irv Wilson that Wilson had a conversation with David Rayburn, where Rayburn informed Wilson that 'he know [*sic*] about the deal they were trying to make [Karlo] for the issue to go away,' that 'they offered [Karlo] something . . . and [Karlo] didn't accept it, so there's going to be a supervisory changing break.'" Pls.' Counter-CSMF at 12-13, ECF No. 397 (retaliation claims) (quoting Dep. of Karlo, July 11, 2011 at 152-153, ECF No. 399-1) (alterations in original). Not surprisingly, "PGW objects to this statement as inadmissible triple hearsay." Def.'s Resp. to Pls.' Counter-CSMF at 30, ECF No. 412 (retaliation claims) (citation omitted).

Dep. of Soderberg at 24, ECF No. 379-14. According to Plaintiffs, Soderberg's comment regarding "new blood" is a reference to Karlo's age.

Plaintiffs filed their Complaint in this Court on September 29, 2010. On October 1, 2010, glassBYTEs.com, an AGRR and insurance industry news website, published an article online which discussed the federal court filing. McCullough, Soderberg,[13] Showers, and Pinchok all allege that this article was the first instance in which they each learned about the EEOC charge or this litigation in general. At the same time, other PGW employees at the Creighton plant have recounted that rumors of the EEOC charge were "widespread" and that they "heard [through] the grapevine that something like that was going on." Other PGW have similarly reported that "the ongoing legal activities" were "talked about by people in Harmarville fairly often."

### ii. McLure

On April 13, 2009, McLure began working for Carol Harris Staffing, LLC, ("Carol Harris"), a third-party employment agency that has provided services to PGW, among other employers. At the request of PPG, Carol Harris placed McLure within its aerospace division at the Glass Research Center in Harmarville, Pennsylvania. According to McLure, PPG's

---

13. Soderberg's testimony is inconsistent regarding when he learned of the EEOC charges and/or the Complaint. For example, the following exchange occurred at his deposition:

> Q.    So you're aware that [Karlo] had instituted some sort of proceeding claiming age discrimination arising from the reduction in force that occurred back in March of 2009, right?
>
> A.    My understanding was, yeah, that was what the group of individuals were filing.
>
> Q.    And that's what was troubling you. That's what you were referring to earlier, correct?
>
> A.    Again, what was troubling to me was the fact that he was working at my plant.
>
> Q.    While simultaneously pursuing a claim for age discrimination?
>
> A.    Yeah.

Dep. of Soderberg, April 10, 2012 at 18-19, ECF No. ECF No. 399-6.

aerospace division and PGW's automotive division are in the same building in Harmarville, PA and share workspace.

At some point that summer, Mark Bulger, a PGW employee who worked at the Harmarville facility, contacted McLure to inquire as to whether he wanted to preform "seasonal type work," such as model number testing, at PGW to fill the voids that existed in his workweek.[14] After negotiating an hourly rate, McLure indicated his willingness to perform the work and secured the temporary assignment at PGW through Carol Harris. As part of the arrangement, McLure worked three days per week at PGW and two days per week at PPG.

On June 7, 2010, McLure switched his staffing agency from Carol Harris to Belcan at the request of PGW, resulting in an increased hourly rate. As part of this transfer, McLure was required to complete various employment documents, execute agreements and acknowledgements, and submit time sheets to and receive paychecks from the agency. The purchase order agreement between Belcan and PGW specified that McLure's temporary position with PGW was scheduled to end on December 10, 2010 subject to early termination.

At PGW, McLure's work with Bulger included validation testing, sample preparation, and data recording. McLure also supported Peter Dishart and Bruce Bartrug with validation testing, and he assisted Julie Bernas on at least one project as well. By all accounts, McLure completed his various assignments in a competent fashion. Based on that performance, Bartug allegedly indicated his intention to hire McLure as a full-time technician and sent him to fork truck training that summer at the direction of Dishart. Even so, Bartug also allegedly suggested to McLure that he would only be hired "if it wasn't for this lawsuit" and/or "the situation" (it is

---

14. PGW conducts model number testing, which is "basically breaking glass," on an annual basis to verify that it meets certain thickness, color combination, and vinyl requirements for its tempered and laminated products.

unclear what term Bartug allegedly used). Regardless, PGW never hired anyone for this specific full-time technician position.

In August 2010, McCullough instructed Bulger that he "could no longer use McLure" in a contractor role and similarly informed Dishart that McLure's "temporary employment had to come to an end."[15] McCullough did not provide an explanation to either Bulger or Dishart. McLure was soon informed of this decision, and he pressed Bulger for details. In a series of e-mails later that month, Bulger offered few specifics but assured McLure that the decision was not performance-related, suggesting that there were instead "too many new people down town [*sic*]." Dep. of McLure, Ex. 27, ECF No. 399-14. According to McLure, Bulger later explained that "the contract was completed, that "the work had dried up," and that "the work just went away." When asked by McLure whether the lawsuit led to this decision, Bulger responded that he "could not say" and simply reiterated his explanation(s).

McLure's assignment ended with PGW on September 19, 2010. Afterward, McLure continued working at PPG through Belcan on a temporary basis.

### B. Procedural History

The Court has detailed the extensive procedural history of this litigation in its March 31, 2014 Memorandum Opinion (ECF No. 343 at 18-26) and hereby incorporates that recitation by reference. Since that time, the Court has granted PGW's renewed motions to bar the proposed expert testimony of Anthony G. Greenwald, Ph.D. and Michael Campion, Ph.D. and granted in part its renewed motion to bar the rebuttal expert reports of David Duffus, CPA/ABV/CFF, CFE. At present, three motions for summary judgment are pending before the Court.

---

15. McCullough's testimony is inconsistent regarding when he learned of the EEOC charges and/or the Complaint. For example, McCullough testified that he did not learn of McLure's involvement in this litigation until the EEOC issued its Dismissal and Notice of Rights letters, even though he had been involved in preparing the response to the EEOC charge.

## II. Legal Standard

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To withstand a motion for summary judgment, the nonmoving party must show a genuine dispute of material fact for trial by citing to particular parts of material in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). *See Celotex Corp.*, 477 U.S. at 322 ("[T]he plain language of Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–248. *See Matsushita*, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56[ ], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) ("To survive summary

judgment, a party must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue.").

The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c) (1)(A), or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact," Fed. R. Civ. P. 56(c)(1)(B). In reviewing all of the record evidence submitted, the court must draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

The court is not permitted to weigh evidence or to make credibility determinations at this stage. *Anderson*, 477 U.S. at 255. Those functions are for the jury, not the court. *Id.* The court is thus limited to deciding whether there are any disputed issues and, if so, whether they are both genuine and material. *Id.*

### III. Discussion

PGW moves for summary judgement on Plaintiffs' individual disparate treatment and disparate impact claims as well as the retaliation claims brought by Karlo and McLure. The Court will address the motions seriatim.

### A. Disparate Treatment

Under the Age Discrimination in Employment Act ("ADEA"), it is "unlawful for an employer to . . . discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age" when the individual is at least forty (40) years old. 29 U.S.C. § 623(a). Where,

as here, a plaintiff alleges a disparate treatment claim under this section of the ADEA, they "must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141-43, 147 (2000)). In other words, "[a] plaintiff can satisfy that burden in one of two ways— either by demonstrating with direct evidence that age was the 'but-for' cause of the employment action, or by using the *McDonnell Douglas* framework to establish that the employer's proffered reason for the employment action is a mere pretext for unlawful discrimination." *Cellucci v. RBS Citizens, N.A.*, 987 F. Supp. 2d 578, 587 (E.D. Pa. 2013) (citing *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009)). In this case, Plaintiffs argue that they can satisfy their burden under either method.

### 1. Direct Evidence

Plaintiffs first argue that Cannon's comments regarding Karlo's "adaptability" constitutes "powerful direct evidence" of age discrimination. Furthermore, Plaintiffs maintain that because Cannon also acted as the decision-maker who selected the remaining Plaintiffs for inclusion in the RIF, a reasonable jury could infer that he applied the same (allegedly) discriminatory selection criteria (*i.e.*, "adaptability") in his decision to terminate McLure, Cunningham, Marietti, and Meixelsberger. The Court cannot agree.

"In an age discrimination case, direct evidence must demonstrate that the decision would not have occurred without improper consideration of age." *Lewis v. Temple Univ. Health Sys.*, No. CIV.A. 13-3527, 2015 WL 1379898, at *9 (E.D. Pa. Mar. 26, 2015) (citing *Gross*, 557 U.S. at 177). Before the Supreme Court's decision in *Gross*, "proving discrimination by direct evidence was a 'high hurdle,' as it required that the evidence 'reveal a sufficient discriminatory

animus' to render any shift in the burden of production 'unnecessary.'" *Cellucci*, 987 F. Supp. 2d at 587 (quoting *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 248 (3d Cir. 2002)). *Gross* went a step further; it "made clear that such burden-shifting is inappropriate in age discrimination cases, and that the burden of persuasion remains with the plaintiff 'even when a plaintiff has produced some evidence that age was one motivating factor in [the] decision.'" *Id.* (quoting *Gross,* 557 U.S. at 180). "The *Gross* holding has therefore altered the direct evidence standard in age discrimination cases in two ways: (1) the plaintiff's direct evidence must do more than 'show that age played some minor role in the decision'—it must show that the decision would not have occurred without improper consideration of age; and (2) the defendant no longer bears the burden of proving that it would have taken the action regardless of age." *Id.* (citing *Kelly v. Moser, Patterson, & Sheridan, LLP,* 348 F. App'x. 746, 749 (3d Cir. 2009)).

Either way, direct evidence of discrimination remains "'evidence which, if believed, would prove the existence of the fact in issue without inference or presumption.'" *Bleistine v. Diocese of Trenton*, 914 F. Supp. 2d 628, 638 (D.N.J. 2012) (quoting *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994)); *see also Garcia v. Newtown Twp.*, 483 F. App'x 697, 704 (3d Cir. 2012) ("Direct evidence may take the form of a workplace policy that is discriminatory on its face, or statements by decision makers that reflect the alleged animus and bear squarely on the adverse employment decision."); *Byrd v. City of Philadelphia*, No. CIV.A. 12-4520, 2014 WL 5780825, at *4 (E.D. Pa. Nov. 6, 2014) (describing direct evidence as the "proverbial 'smoking gun'") (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir. 1994)). In contrast, "evidence is not direct 'where the trier of fact must infer the discrimination on the basis of age from an employer's remarks.'" *Bleistine*, 914 F. Supp. 2d at 638 quoting *Torre*, 42 F.3d at 829). "As a practical matter, 'only rarely will a plaintiff have direct evidence of discrimination.'"

23

*Garcia*, 483 F. App'x at 704 (quoting *Geraci v. Moody-Tottrup, Int'l, Inc.,* 82 F.3d 578, 581 (3d Cir. 1996)).

Against this backdrop, the Court cannot conclude that Plaintiffs have presented direct evidence of age discrimination: Cannon's comments regarding Karlo's "adaptability" require an inference to conclude that "adaptability" was a proxy for age (as opposed to his ability to fill multiple positions, work in a less-populated environment, obtain new skills, change job responsibilities, etc.). *See Scheick v. Tecumseh Pub. Sch.*, 766 F.3d 523, 531 (6th Cir. 2014). And here, there is no evidence that Cannon ever used "adaptability" as a shorthand reference to the younger employees that remained at PGW after the RIF.[16]

Nor is there any evidence that Cannon ever told Karlo that he was selected for the RIF because younger employees were more "adaptable" than him, notwithstanding Plaintiffs' attempts to construct this statement through their creative use of ellipses. *See supra* n.5.; *c.f. Beshears v. Asbill, Inc.*, 930 F.2d 1348, 1354 (8th Cir. 1991) (holding that a company president's statement "to the effect that older employees have problems adapting to changes and new policies," along with another decision-maker's statements that younger people were more adaptable, all made during the decisional process, amounted to direct evidence of age discrimination under the *Price Waterhouse* analysis). There also is no evidence that Cannon ever considered the "adaptability" of McLure, Cunningham, Marietti, and Meixelsberger in making his decision. Rather, Cannon discussed with Karlo (and Karlo alone) that the remaining employees were more adaptable than him as PGW moved forward with its new consolidated business model after the March 2009 RIF.

---

16. It is undisputed that of the twenty-one salaried associates in Manufacturing Technology not selected for the RIF, Karlo (age 51.36) was younger than twelve employees (ages 62.53, 60.47, 59.62, 59.41, 59.12, 58.96, 57.73, 55.67, 54.15, 53.99, 53.02, 52.64) and older than the other nine, with six of whom were within five-years of his age (ages 51.24, 49.49, 46.70, 46.55, 46.54, 46.16). *See* Pls.' RSOF re Def.'s Mot. for Decert. at 11-12, ECF No. 403 (disparate treatment and disparate impact claims).

At the very most, Cannon's remarks, as the decision-maker in the immediate aftermath of a termination meeting during which a thirty-year veteran of the company loses his job, are "in bad taste[,] bespeak a certain insensitivity, and provide circumstantial evidence of discrimination." *Byrd*, 2014 WL 5780825, at *5. More likely, they represent an unfortunate business reality. Be that as it may, his comments regarding Karlo's adaptability alone are not so revealing of discriminatory animus that a reasonable jury could conclude that age was the "but-for" reason for the adverse employment action. The Court will therefore proceed to analyze the disparate treatment claims under the alternative method of proof.

### 2. Circumstantial Evidence

Where a plaintiff seeks to prove his or her case through circumstantial evidence rather than direct evidence, the three-stage shifting burdens of proof developed for employment discrimination cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *See Smith*, 589 F.3d at 689 (holding that "the but-for causation standard required by *Gross* does not conflict with [its] continued application of the *McDonnell Douglas* paradigm in age discrimination cases."). In the initial phase of the analysis, a plaintiff must establish a prima facie case of discrimination which requires the plaintiff to demonstrate: (1) that he was a member of the protected age class; (2) that he was qualified to hold the position; (3) that he suffered an adverse employment decision; and (4) that he was replaced by a significantly younger individual or that younger employees received comparatively more favorable treatment to create an inference of age discrimination. *See Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 330 (3d Cir. 1995). Once the plaintiff establishes all four of the elements, the burden of production then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the unfavorable employment decision. *Smith*, 589 F.3d at 689-90. "If the employer does so,

the burden of production returns to the plaintiff to show that the employer's proffered rationale was merely a pretext for age discrimination." *Id.* at 690. The burden of persuasion, "including the burden of proving 'but for' causation or causation in fact," remains with the plaintiff at all times throughout this exercise.[17] *Id.*

### i. Prima Facie Case

"When an employee is terminated during a [RIF] as is the case here, the fourth element becomes whether the employee can show 'that the employer retained someone similarly situated to him who was sufficiently younger.'" *Klinman v. JDS Uniphase Corp.*, 439 F. Supp. 2d 401, 405 (E.D. Pa. 2006) (quoting *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 250 (3d Cir. 2002)).

"In order to determine who might qualify as a similarly situated employee [courts] must look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace." *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 305 (3d Cir. 2004).[18] For example, "[a] manager is not similarly situated to her subordinates or to a non-

---

17. Plaintiffs do not even address the first two prongs of the *McDonnell Douglas* framework anywhere in their filings. Rather, they skip to the pretext analysis, based on a pronouncement by the Fifth Circuit in *Palasota v. Haggar Clothing Co.*, which states as follows:

> A plaintiff must show that "(1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) *otherwise discharged because of his age*."

342 F.3d 569, 576 (5th Cir. 2003) (emphasis in original) (quoting *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 (5th Cir. 1993)); *see also Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 649-51 (3d Cir. 1998) (Pollak, J., concurring) (discussing the Fifth Circuit's formulation). The Court recognizes that the "fourth element must be relaxed in certain circumstances, as when there is a reduction in force," but the evidence that Plaintiffs rely upon is not supported by the record. *Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir. 1994). That is, Plaintiffs rely upon their manufactured version of Cannon's comments to Karlo, *see supra* n.5, and continue to insist that PGW ignored long-standing RIF procedures, even though that company-wide system only existed at its predecessor, non-party PPG, *see supra* n.4. Accordingly, the Court will proceed to analyze whether Plaintiffs have shown "that the employer retained someone similarly situated to him who was sufficiently younger." *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 250 (3d Cir. 2002).

18 Although the plaintiff in *Monaco* brought his claim under the New Jersey Law Against Discrimination ("NJLAD") and not under the ADEA, the court of appeals "d[id] not suggest that the ['similarly situated'] standard would be different under the ADEA," but "merely recognize[d]" that the plaintiff's claim for age discrimination

manager." *Wimberly v. Severn Trent Servs.*, Inc., No. CIV.A.05 2713, 2007 WL 666767, at *4 (E.D. Pa. Feb. 26, 2007).  Nor are employees in the same department or sub-department similarly situated when they have duties that are not comparable.  *See Anderson*, 297 F.3d at 250. Ultimately, "[t]his determination requires a court to undertake a fact-intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible manner."  *Monaco*, 359 F.3d at 305 (3d Cir. 2004) (citing *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999)).

As for what constitutes a "sufficiently younger" employee, the Court of Appeals for the Third Circuit has not adopted a bright-line rule, but it has provided some guidance.  *See Steward v. Sears Roebuck & Co.,* 231 F. App'x. 201, 209 (3d Cir. 2007); *see also Barber v. CSX Distribution Servs.,* 68 F.3d 694, 699 (3d Cir. 1995) ("There is no magical formula to measure a particular age gap and determine if it is sufficiently wide to give rise to an inference of discrimination, however, case law assists our inquiry.").  For example, in *Narin v. Lower Merion School District,* our court of appeals observed that the difference in age between a fifty-six-year-old employee and another who was forty-nine-years-old was not sufficient enough to allow an inference of discrimination.  206 F.3d 323, 333 n.9 (3d Cir. 2000).  More recently, in *Showalter v. University of Pittsburgh Medical Center*, the Court of Appeals held that an eight year age differential was sufficient to satisfy the fourth element of a prima facie case.  190 F.3d 231, 236 (3d Cir. 2005).  District courts in the Third Circuit have followed a similar trend. *See Fitzpatrick v. Nat'l Mobile Television,* 364 F. Supp. 2d 483, 491 (M.D. Pa. 2005) ("This four-year age difference is insufficient to raise an inference of discriminatory action."); *Lloyd v. City of Bethlehem,* C IV.A. 02–CV–00830, 2004 WL 540452, at *6 (E.D. Pa. Mar. 3, 2004) ("The caselaw in this Circuit consistently holds that an age gap of less than five years is, as a matter of

---

arose solely under the NJLAD.  *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 306 n.12 (3d Cir. 2004); *see also Klinman v. JDS Uniphase Corp.*, 439 F. Supp. 2d 401, 406 (E.D. Pa. 2006) (recognizing that the similarly situated standard is the same under the NJLAD and the ADEA).

law, insufficient to establish fourth element of the prima facie test."); *Gutknecht v. SmithKline Beecham Clinical Labs., Inc.,* 950 F. Supp. 667, 672 (E.D. Pa. 1996) ("Although no uniform rule exists, it is generally accepted that when the difference in age between the fired employee and his or her replacement is fewer than five or six years, the replacement is not considered sufficiently younger, and thus no prima facie case is made").

None of the Plaintiffs can show that PGW retained someone similarly situated who was sufficiently younger. In each instance, PGW either eliminated the job responsibilities of that particular Plaintiff and/or (re)-assigned the tasks to older employees who were retrained.

As for Karlo (age 51.36), a Senior Engineering Specialist who developed tooling, and McLure (age 54.83), a Senior Technical Assistant Soldering who conducted validation testing, their primary work duties were outsourced by PGW in connection with its reorganization. Their ongoing duties and tasks were otherwise assumed by Irv Wilson (age 59.41) and John Bender (age 54.15)—both of whom are older than (or nearly the same age as) Karlo and McLure and held job functions that were not comparable to Karlo and McLure (Wilson was an engineer; Bender was the loan resource that was intimate with the instrumentation for Hercon scanners and GTTC). Similarly, the job tasks of Meixelsberger (age 52.73), a Senior Technical Assistant who worked in Windshield Bending, were absorbed by Wilson and Bender—both of whom are also older than Meixelsberger.

Much like Karlo, McLure and Meixelsberger, PGW reassigned various engineers to take on the job responsibilities of Cunningham (age 52.58), a Senior Technical Assistant who worked in the Sidelight Process and Marietti (age 55.33), a Senior C/M Specialist who worked in Tooling & Instrumentation. Two of these engineers – Fecik (age 57.73) and Cleary (age 59.62) – are older than Cunningham and Marietti, and the other – Schwartz (age 51.24) – is only one

year younger than Cunningham (in addition to being his supervisor) and four years younger than Marietti, an age gap that is not sufficiently wide to give rise to an inference of discrimination.

At the same time, all five Plaintiffs point to a single, individual, Steve Horcicak (age 36.49), as the sufficiently younger similarly situated employee who was retained by PGW. But once again they miss the mark. Horcicak's job function and duties were unmatched by any Plaintiff, as he worked in the operationally-critical area of fracture mechanics, requiring a skill-set that none of the Plaintiffs possessed. And Plaintiffs do not cite any evidence that Horcicak (or any sufficiently younger employee) assumed any of Plaintiffs' job tasks. In other words, Horcicak is not a valid comparator for any of the Plaintiffs, and the circumstances otherwise do not support an inference of discrimination.

Because Plaintiffs have not shown that PGW retained a similarly situated employee who was sufficiently younger, they cannot meet the fourth element of their prima facie case, and therefore, the Court need not proceed to the second (or third) step of the *McDonnell Douglas* test. Accordingly, the Court will grant PGW's motion for summary judgment on Plaintiffs' individual disparate treatment claims.

## B. Disparate Impact

"In a disparate impact claim under the ADEA, the plaintiff challenges a specific, facially neutral employment practice that operates to 'deprive [the] individual of employment opportunities or otherwise adversely affect his status as an employee.'" *Embrico v. U.S. Steel Corp.*, 404 F. Supp. 2d 802, 817 (E.D. Pa. 2005) (quoting *Smith v. City of Jackson*, 544 U.S. 228, 236 (2005). "To establish a disparate impact claim, a plaintiff must identify the specific practice(s) alleged to have created a disparate impact, and show that this practice caused observable statistical differences affecting the protected class." *Petruska v. Reckitt Benckiser,*

*LLC*, No. CIV.A. 14-03663 CCC, 2015 WL 1421908, at *6 (D.N.J. Mar. 26, 2015) (citing *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005)).

Plaintiffs cannot, however, make this showing. On July 13, 2015, this Court granted PGW's motion to bar Plaintiffs' purported statistical expert, Dr. Michael Campion, from testifying at trial, finding that the requirements of Rule 702 were not met. *See Karlo v. Pittsburgh Glass Works, LLC*, No. 2:10-CV-1283, 2015 WL 4232600, at **10-13 (W.D. Pa. July 13, 2015). And "[w]ithout statistical proof, disparate impact is not established." *Cardelle v. Miami Beach Fraternal Order of Police*, 593 F. App'x 898, 902 (11th Cir. 2014) (citation omitted); *see Stockwell v. City & Cnty. of San Francisco*, 749 F.3d 1107, 1115 (9th Cir. 2014); *see also Crawford v. Verizon Pennsylvania, Inc.*, -- F. Supp. 3d --, No. CIV.A. 14-3091, 2015 WL 1636866, at *10 (E.D. Pa. Apr. 13, 2015) ("[D]ata concerning six individuals, in the absence of a statistical analysis or expert, are not of the kind or degree sufficient to support any allegation of significant disparate impact.").

But even assuming that Dr. Campion (and his statistical report) had survived the *Daubert* challenge, the Court still cannot agree with Plaintiffs that an over-fifty-years-old subgroup is cognizable under the ADEA. *See generally Karlo v. Pittsburgh Glass Works*, LLC, No. 2:10-CV-1283, 2014 WL 1317595, at **16-17 (W.D. Pa. Mar. 31, 2014) (discussing subgrouping under the ADEA). Every court of appeals to face the issue has declined to recognize this theory with regard to disparate impact claims.[19] *See E.E.O.C. v. McDonnell Douglas Corp.*, 191 F.3d 948 (8th Cir. 1999); *Smith v. Tennessee Valley Auth.*, 924 F.2d 1059 (6th Cir. 1991); *Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364 (2d Cir. 1989), *superseded on other grounds by*

---

19. As one district court recently recognized, "the Third Circuit does not appear to have considered the issue of subgroup disparate impact claims, the majority view amongst the circuits that have considered this issue is that a disparate impact analysis must compare employees aged 40 and over with those 39 and younger, and therefore it is improper to distinguish between subgroups within the protected class." *Petruska v. Reckitt Benckiser, LLC,* No. CIV.A. 14–03663 CCC, 2015 WL 1421908, at *6 (D.N.J. Mar.26, 2015) (citations omitted).

*statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074, *as recognized in Smith v. Xerox Corp.*, 196 F.3d 358, 368 (2d Cir. 1999). Several district courts have followed this approach. *Rudwall v. Blackrock, Inc.*, C09-5176TEH, 2011 WL 767965, at **10-11 (N.D. Cal. Feb. 28, 2011); *Schechner v. KPIX-TV*, C 08-05049 MHP, 2011 WL 109144, at *4 (N.D. Cal. Jan. 13, 2011); *Kinnally v. Rogers Corp.*, CV-06-2704-PHX-JAT, 2009 WL 597211, at **9-10 (D. Ariz. Mar. 9, 2009); *see also Fulghum v. Embarq Corp.*, 938 F. Supp. 2d 1090, 1131 n.156 (D. Kan. 2013); *but see Karlo v. Pittsburgh Glass Works, LLC*, 880 F. Supp. 2d 629, 636 (W.D. Pa. 2012); *Graffam v. Scott Paper Co.*, 848 F. Supp. 1, 3 (D. Me. 1994); *Finch v. Hercules Inc.*, 865 F. Supp. 1104, 1129 (D. Del. 1994). This Court finds those appellate decisions persuasive and instructive. Accordingly, the Court will grant PGW's motion for summary judgment on Plaintiffs' disparate impact claims.[20]

## C. Retaliation

The retaliation claims brought by Karlo and McLure against PGW primarily proceed under the theory that PGW, as their purported employer, summarily terminated their employment because they refused to withdraw their EEOC charges. Alternatively, they assert that, even if their status as contract employees bars their retaliatory discharge claim, they still may maintain a failure to hire claim.

As an initial matter, Karlo and McLure must each first establish that they were in fact an employee of PGW and not of Belcan/Carol Harris, the temporary staffing agencies, in order to maintain their retaliatory discharge claim. "In order to determine whether a person is an employee for purposes of the ADEA, the common law of agency and the traditional master-

---

20. To hold otherwise, as the Eight Circuit recognized, "would be to require an employer engaging in a RIF to attempt what might well be impossible: to achieve statistical parity among the virtually infinite number of age subgroups in its work force." *McDonnell Douglas Corp.*, 191 F.3d at 951. Moreover, "[a]doption of such a theory [ ] might well have the anomalous result of forcing employers to take age into account in making layoff decisions, which is the very sort of age-based decision-making that the statute proscribes." *Id.*

servant doctrine applies." *Cauler v. Lehigh Valley Hosp., Inc.*, No. 15-CV-01082, 2015 WL 2337311, at *3 (E.D. Pa. May 14, 2015) (citations omitted); *see also Pavlik v. Int'l Excess Agency, Inc.*, 417 F. App'x 163, 166 (3d Cir. 2011) ("Both Title VII and ADEA use the same test to determine whether an individual is an employee or an independent contractor.").  Specifically, the Court should consider:

> the hiring party's right to control the manner and means by which the product is accomplished[;] . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Shah v. Bank of Am.*, 346 F. App'x 831, 834 (3d Cir. 2009) (quoting N*ationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-24 (1992)).  "No one factor is dispositive, and the list is not exhaustive." *Mulzet v. R.L. Reppert, Inc.*, 54 F. App'x 359, 360 (3d Cir. 2002).

At the same time, "[t]he essence of the *Darden* test is whether the hiring party has the 'right to control the manner and means by which the product is accomplished.'" *Plaso v. IJKG, LLC*, 553 F. App'x 199, 204 (3d Cir. 2014).  In making this determination, a court "may focus on three indicia of control: (1) which entity paid plaintiff; (2) who hired and fired plaintiff; and (3) who 'had control over [plaintiff's] daily employment activities.'" *Id.* (quoting *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 119 (3d Cir. 2013)).

Although the record is somewhat sparse regarding some of the *Darden* factors, the only consideration that supports PGW's position relates to the compensation of Karlo and McLure (which they apparently negotiated in advance with PGW), the benefits they received, and (perhaps) their tax treatment, as reflected in the employment paperwork.  Both Karlo and

McLure sent their time sheets to Belcan (which PGW nevertheless had to approve), received their paychecks from Belcan, and had their income taxes withheld by Belcan. In addition, Karlo received over $10,000 in unemployment benefits through Belcan after his time at PGW had ended. Even so, "which entity paid plaintiffs" is the only differences between their previous employment with PGW and their later placement at its facilities.

All other applicable considerations weigh in their favor. PGW (through its employees) sought out both Karlo and McLure and arranged for their hiring through Belcan, which merely served as a conduit for their return to PGW. PGW also controlled their day-to-day employment activities: it assigned them to projects; supervised and reviewed their work, and set their schedule. In addition, Karlo and McLure also worked exclusively in PGW's facilities where they used its equipment, instruments, and tools, engaged in PGW's regular (and continued) course of business of manufacturing and testing automotive glass products on a (nearly) daily basis. Belcan had no involvement in these day-to-day activities. It was also PGW (and not Belcan) that decided to end the placement of both Karlo and McLure at its facilities. Karlo and McLure were thus both "employees" of PGW.

As to whether Plaintiffs can establish prima facie retaliation cases,[21] the Court is not convinced that there are no genuine issues as to any material fact when the evidence is viewed in the light most favorable to the non-moving parties. For example, the timing of the decision to terminate Plaintiffs (and/or to not rehire them into non-contract positions), and precisely who knew what when—which would seem to be a material fact in this case—remains entirely unclear (perhaps because both sides somewhat distort the record). Moreover, it is incorrect, not to

21. Under the ADEA, a prima facie case of retaliation requires a plaintiff must show that: "(1) s/he was engaged in a protected activity; (2) the defendant took an adverse employment action after or contemporaneous with the plaintiff's protected activity; and (3) a causal link exists between the plaintiff's protected activity and the adverse employment action." *McClement v. Port Auth. Trans-Hudson*, 505 F. App'x 158, 162-63 (3d Cir. 2012) (citing *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 508-09 (3d Cir. 2004)).

mention self-serving, for PGW to rely on the deposition testimony of the relevant decision-makers to the exclusion of contrary evidence in positing that they knew nothing of this litigation before the glassBYTEs.com article—even when McCullough himself had been involved in preparing the response to the EEOC charge. The trier of fact (*i.e.*, not PGW) must determine whether the testimony of Karlo and McLure is credible in light of the relevant decision-makers. In addition, it also remains unclear as to whether there was ever any discussion of the EEOC charge in either plant, what constituted the so-called "issue"/"the situation," and how the decisions to end the placements were made. Contrary to PGW's suggestion, these disputed facts cannot be dismissed as watercooler gossip; they are instead questions for a jury. Accordingly, the Court will deny PGW's motion for summary judgment on the retaliation claims of Karlo and McLure.

## IV. Conclusion

For the reasons hereinabove stated, the Court will grant PGW's motions for summary judgment on the Plaintiffs' individual disparate treatment and disparate impact claims; deny PGW's motion for summary judgment on the retaliation claims of Karlo and McLure; and deny PGW's motion to strike unsupported facts and deem improperly contested facts admitted.

An appropriate order follows.

McVerry, S.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **RUDOLPH A. KARLO, MARK K. MCLURE, WILLIAM S. CUNNINGHAM, JEFFREY MARIETTI, and DAVID MEIXELSBERGER,** | ) )<br>) )<br>) ) **2:10-cv-1283** |
| **Plaintiffs,** | ) ) |
| **vs.** | ) ) ) |
| **PITTSBURGH GLASS WORKS, LLC,** | ) ) |
| **Defendant.** | ) |

## ORDER OF COURT

AND NOW, this 3rd day of September, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** as follows:

(1) the MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFFS' INDIVIDUAL DISPARATE TREATMENT CLAIMS (ECF No. 372) is **GRANTED**;

(2) the MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFFS' INDIVIDUAL DISPARATE IMPACT CLAIMS (ECF No. 374) is **GRANTED**;

(3) the MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF KARLO'S AND PLAINTIFF MCLURE'S RETALIATION CLAIMS (ECF No. 377) is **DENIED**; and

(4) the COMBINED MOTION TO STRIKE UNSUPPORTED FACTS AND DEEM IMPROPERLY CONTESTED FACTS ADMITTED (ECF No. 417) is **DENIED**.

**IT IS FURTHER ORDERED** that the caption in this matter is hereby **AMENDED** as

follows:

| | |
|---|---|
| **RUDOLPH A. KARLO and MARK K. MCLURE,** | ) ) ) |
| **Plaintiffs,** | ) **2:10-cv-1283** ) |
| **vs.** | ) ) |
| **PITTSBURGH GLASS WORKS, LLC,** | ) ) |
| **Defendant.** | ) ) |

BY THE COURT:

s/Terrence F. McVerry
Senior United States District Judge

cc:     All counsel of record.
        (via CM/ECF)